215 N.J. Super. 63 (1987)
521 A.2d 346
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
FRANKLIN ARIAS SANTANA AND JUAN NIEVES TECHERA, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 1986.
Decided January 14, 1987.
*65 Before Judges DREIER and STERN.
Christopher T. Van Wagner, Special Deputy Attorney General and Acting Assistant Prosecutor argued the cause for appellant (Paul T. Koenig, Jr., Prosecutor Mercer County, attorney; Christopher Van Wagner, of counsel and on letter brief).
Claire Drugach, Assistant Deputy Public Defender argued the cause for respondent Santana (Alfred A. Slocum, Public Defender, attorney; Claire Drugach, of counsel and on letter brief).
Franklin L. Flacks argued the cause for respondent Techera (Rottkamp & Flacks, attorneys; Franklin Flacks, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
The State has appealed by leave granted from an order of the Law Division suppressing evidence of substantial quantities of cocaine recovered from behind the door panels of a car driven by defendant Santana and in which defendant Techera was a passenger. The car was owned by Techera's ex-wife and he had executed a consent to its complete search.
*66 On September 18, 1984 two New Jersey State Troopers stopped a vehicle bearing Florida license plates on the New Jersey Turnpike. In response to an inquiry from Trooper Michael Nutt, the driver, a Hispanic male, produced his driver's license and the vehicle registration. The passenger, also a Hispanic male, stated that his ex-wife owned the car and knew that he (Techera) was using it. Trooper Nutt noticed a carton of untaxed cigarettes that had been purchased in the Carolinas and asked the occupants to step from the vehicle to permit a search of the passenger compartment for any possible further contraband.[1] Trooper Nutt's partner escorted the two occupants to the patrol vehicle while Trooper Nutt searched the car. He saw an open brown paper bag with a small amount of a white powder substance which he believed was either cocaine or some type of additive or cutting agent used in preparing cocaine for distribution. The packaging, however, was unusual. He took the bag bearing the powder to the patrol vehicle to show it to his partner and then orally advised defendant Techera of his Miranda rights. Techera stated he understood his rights and that he was fluent in both English and Spanish, whereupon he explained the Miranda warnings to Santana in Spanish. In response to the trooper's questions, Techera stated he knew nothing about the white powder substance.
At that time neither defendant was under arrest nor had the police decided to arrest them. The officers were suspicious enough of the situation, however, to question Techera further concerning his travel plans. Techera responded that they were going to visit his sister and, when asked where she lived, Techera became visibly nervous, but eventually told them the location. Techera was asked if he had ever been arrested and responded that he had been convicted of conspiracy to distribute cocaine and had "done time" in Georgia.
*67 Trooper Nutt determined that based upon the then existing circumstances he wanted to search the car, but he did not feel he had probable cause either to obtain a search warrant or to place defendants under arrest. He, therefore, asked defendant Techera, who had stated that he had been given the use of the car, for consent to search the vehicle, stating further that Techera could refuse to give consent and could withdraw his consent at any time during the search. He was told, however, that if anything was found it could be used against him. Trooper Nutt then filled out a written consent to search form printed in Spanish. Techera read it, indicated he understood it, and signed, thereby giving consent to "a complete search" of his car. Techera appeared extremely cooperative and volunteered the comment that he had nothing to hide.
After the form was signed, defendants and both officers walked to the rear of the vehicle. Trooper Nutt opened the trunk and started to search a suitcase and shoulder bag. When he began to open the shoulder bag, identified as Techera's, Santana became extremely agitated and excited, went to the trunk and began throwing the bags out of the trunk, pulling up the trunk's carpet and shouting "nothing, nothing, nothing!"
The officers, still believing that there was a need to investigate, decided that it would be preferable to return to their headquarters and complete the investigation there. Trooper Nutt explained this to Techera who, remaining very cooperative, agreed to drive the vehicle to headquarters accompanied by Santana but followed by the two officers in their patrol car. Upon reaching headquarters the troopers asked Techera to park his vehicle in the garage on the lower level. Defendants were then escorted up one flight of stairs to the radio room area where for safety reasons defendants were asked to wait in a holding cell immediately adjacent to and in view of the radio room. Trooper Nutt explained to Techera that the officers intended to finish searching the car downstairs. Techera remained pleasant and cooperative, saying "no problem, no problem, we'll stand by up here." The officers then brought both *68 men coffee and returned to the garage. Techera does not contest the fact of his apparent willingness to remain in the cell or his continuous outward cooperation with the police.
When the officers returned to the garage, Trooper Nutt resumed his search of Techera's shoulder bag and found inside it other packaging containing a second brown paper bag similar to the one he had located on the floor of the car. The second bag contained a much larger quantity of the white powder substance. Trooper Nutt then believed that there were narcotics hidden somewhere in the car. He stated that in his experience there were several commonly used places for hiding contraband, such as the spare tire well, false compartments in the trunk, false oil cans, over the wheel wells, under the carpet, inside hubcaps, in false containers under the hood, taped under a seat or the dashboard, behind false radios or behind pop-out type door panels. He proceeded first to search the car's trunk and found no contraband. He then went to the passenger door panel, reached under the bottom flap and popped out the panel by pulling on it. He reached into the door frame and felt a brick-like substance which he removed. His partner found and removed an identical object from the driver's door. The package contained a whiter substance than that found in the paper bags; from the color and packaging the troopers correctly believed that they had found cocaine. Each package contained approximately one kilogram. The door panels could be completely removed by unscrewing two screws and removing the door lock button. By proceeding as they did, the officers may have actually bent the door panel leaving small damage marks, although Trooper Nutt could not recall if the marks had been there before he had opened the panel. After the discovery of the cocaine the officers called for assistance from narcotic detectives, and approximately one hour later Trooper Nutt advised both defendants that they were under arrest.
The trial judge granted defendant Santana's motion to suppress on the grounds that defendant Techera's consent was not valid as to Santana. The judge also suppressed the cocaine *69 found in the door panels on the basis that the search of the panels exceeded the scope of consent and, therefore, was unreasonable. In addition, he held that the consent given included the explicit right to withdraw the consent at any time, which right was violated by not having defendants present at the scene of the search.

I
Treating first the issue of the third-party consent to the search, we find that the trial judge mistakenly applied State v. Pierce, 190 N.J. Super. 408, 417 (App.Div. 1983) which in turn relied upon State v. Alston, 88 N.J. 211, 228 (1981). The search in Pierce, however, implicated an entirely different principle, namely, that a search of a car consented to by one having control of the vehicle does not necessarily include a search of the private property of another contained within the car, that property being defendant Carroll's pocketbook. Pierce's reliance upon Alston was solely for the principle of standing, i.e., that New Jersey liberally views the issue of standing and permits a defendant to question the validity of a search "if he has a proprietary, possessory or participatory interest in either the place searched or the property seized." State v. Alston, 88 N.J. at 228. The issue before us, however, is not one of standing. There is no question that defendant Santana had standing to raise the issue of an unlawful search and seizure had contraband been found in his private property, since only he could have given the consent to such a search.
New Jersey, however, recognizes that there may be dual control over a particular location. In such a case either party has the authority to grant the right to search at that location. See State v. Douglas, 204 N.J. Super. 265, 276-278 (App.Div. 1985); State v. Miller, 159 N.J. Super. 552, 556 (App. Div. 1978), certif. den. 78 N.J. 329 (1978). Cf. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), applying the federal standard. It is unclear from the facts here *70 whether Santana read the Spanish language consent form, or otherwise understood that he had any right to demand a halt to the search. In fact the search proceeded solely on Techera's authorization. If, however, Santana did not understand that he had the right to object, his silence must be construed as at least a failure to consent. It might even rise to a demand to discontinue the search, considering his conduct when the trunk and his personal property were to be examined. An issue not addressed in Matlock was whether the warrantless search was valid if only one of the two defendants having common rights to the property consented to the search when both were present. Moreover, the jurisdictions are split on the question of whether consent of one joint occupant may override the active objection of another joint occupant who is present at the time of the search. Compare People v. Cosme, 48 N.Y.2d 286, 422 N.Y.S. 2d 652, 397 N.E.2d 1319 (1979) (consent of one joint occupant binding on another objecting joint occupant), with Tompkins v. Superior Court, 59 Cal.2d 65, 378 P.2d 113, 27 Cal. Rptr. 889 (1963) (an absent joint occupant may not authorize search over objection of joint occupant who is present); Silva v. State, 344 So.2d 559 (Fla. 1977) (joint occupant's consent not valid in face of other joint occupant's objection where both are present); and Dorsey v. State, 2 Md. App. 40, 232 A.2d 900 (Ct.App. 1967) (same).
The issue may be resolved by resort to an intermediate ground. The New York rule of People v. Cosme, supra, may be applied, tempered by an evaluation of the property rights of the respective actors. The determination of the validity of the search should be based upon an evaluation of the objecting party's rights to the property searched against those of the consenting joint possessor. See United States v. Impink, 728 F.2d 1228 (9th Cir.1984) (where suspect is present and objects to search, implied consent by third party with inferior property interest is not effective); Lucero v. Donovan, 354 F.2d 16 (9th Cir.1965) (permanent resident's objection prevails over part-time resident's consent). Thus, if the objecting party has the right *71 to terminate or limit the consenting party's control of the area, the objection must be heeded. If, however, the consenting party has equal or superior rights over the area searched, the police may validly rely on the permission given and continue their search, even in the face of another's objections.[2] These principles are equally applicable to both personal property such as cars and real estate. See Embry v. State, 46 Wis.2d 151, 174 N.W.2d 521 (1970); Ferrell v. State, 7 Ark. App. 36, 644 S.W.2d 302 (Ct.App. 1982).
Since the reasonableness of the police action at the time is the question to be determined, the case must turn upon the appearances of control at the time, not any subsequent resolution of questions of title or property rights. Here, the passenger, Techera, who gave permission to search was the one who apparently had the owner's permission to use the car. When the search was authorized he clearly appeared to have a property interest equal or superior to that of Santana who was merely the driver. We conclude, therefore, that although defendant Santana had standing to test the search and seizure, the apparent joint or superior control exercised by Techera over the car authorized him to permit the search without Santana's consent, and even over his objection.

II
We then must determine as to both defendants whether the scope of the search exceeded the permission given by defendant Techera. The consent may have been vitiated by either of two actions by the troopers: first, separating Techera from the location of the search, and second, allegedly invading the structural *72 integrity of the vehicle, if such invasive search were not included within the scope of the consent.

A.
There is no question that the scope of a consent search is limited by the terms of its authorization. Walter v. United States, 447 U.S. 649, 656-57, 100 S.Ct. 2395, 2401-02, 65 L.Ed.2d 410, 417-18 (1980). The State has conceded that defendants need not rely upon any implied right to terminate the consent search, since at Trooper Nutt's suggestion, the consent was expressly given upon condition that the search could be terminated at Techera's direction at any time. Cf. United States v. Dichiariante, 445 F.2d 126 (7th Cir.1971); United States v. Bily, 406 F. Supp. 726 (E.D.Pa. 1975). Although the State has urged that if Techera wished to revoke his consent while in the holding cell, he should have tried to get the attention of the radio dispatcher who could then have called down to the garage and relayed Techera's wishes to the investigating officers. This is farfetched. There is no indication that there would be a timely transmission of such a message, and even more important, Techera would not have possessed sufficient information to know whether to revoke his consent in order to stop the search.
There are, however, circumstances from which the trial judge could have determined that the termination on demand condition was waived when Techera stated that he had no objection to waiting in the holding cell while the officers completed the search. This statement could have been found to have been an implicit waiver of the express condition that Techera be present and able to stop the search. If the express condition were waived, then for the search to be invalid for this reason, we would be required to determine as a matter of law that a consent search (with either an express or implied right to *73 terminate it) cannot be performed on outside of the presence of the person who gave the authority to search, even though the person has agreed to his absence. We find no authority to so hamper law enforcement. So long as there is a true waiver, i.e., the voluntary relinquishment of a known right, we see no reason why a competent individual cannot consent to a search being accomplished outside of his presence.
Such a conclusion is within the constitutional protections articulated by our Supreme Court in State v. Johnson, 68 N.J. 349, 352-354 (1975), even recognizing that Johnson imposes a more stringent test under the N.J. Const. (1947), Art. I, par. 7, than the federal standards under the Fourth and Fourteenth amendments of the United States Constitution. See Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). Notwithstanding Johnson, so long as defendant agreed to this isolation from the site of the search, no explicit waiver or notice to defendant of a continuous right to revoke his consent was necessary. The State, however, has the burden of proving an implicit (or explicit in the appropriate case) waiver by a preponderance of the credible evidence. State v. Sugar, 100 N.J. 214, 238-39 (1985); State v. Whittington, 142 N.J. Super. 45, 51 (App.Div. 1976). Since the trial judge determined that the search conducted out of defendant Techera's presence was a per se violation of the agreement, we must remand this matter for a rehearing, fact finding, and a redetermination of the waiver issue by the trial judge.

B.
Defendants next contend that the State exceed the scope of the consent search by improperly invading the structural integrity of the vehicle, citing State v. Murray, 151 N.J. Super. 300 (App.Div. 1977), cert. den. 75 N.J. 541 (1977). The trial court relied upon Murray in determining that the *74 bending of the door panels and reaching behind them to discover the packages of cocaine violated the scope of the consent search. In Murray, after vials of apparent marijuana were discovered in the passenger compartment, the searching officer attempted to gain access to a compartment under the van's sink. To do this he removed the driver's seat from the van by manually taking out a pin holding the seat into its brackets. This court reversed the trial court's denial of defendant's motion to suppress. With respect to the action of removing the driver's seat we stated:
We are convinced, however, that when the officer, unsuccessful to that point in uncovering additional contraband, commenced interfering with the structural integrity of the vehicle itself, the search he was conducting transcended all bounds of reasonableness. A search reasonable in its inception may nonetheless violate the Fourth Amendment by virtue of its intolerable intensity and scope. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Its scope and intensity must not be disproportionate to the circumstances giving rise to it. The notion that a search originally justified may be without limit is rejected. [Id. at 307].
There is a different scope, however, to a search conducted immediately following an arrest to determine whether there is a weapon or additional contraband that could be reached or disposed of prior to obtaining a search warrant and, as here, a complete search of the vehicle. What we have before us is a consent search in which defendant Techera agreed to a "complete search" of the vehicle, not merely a cursory examination of the passenger compartment and trunk. The search that may be conducted pursuant to such a consent is akin to the search permitted upon a valid warrant; and it would be futile for defendants to argue that if a warrant had issued for a search of the vehicle, the compartment beneath the sink in Murray or the area behind the door panels here would have been sacrosanct.
In the case before us Techera could have declined to grant consent, in which case either there would have been sufficient evidence for the police to obtain a warrant, or defendants would have been free to proceed on their trip. Trooper Nutt candidly *75 stated that at the point the consent was signed he thought the latter course was his only alternative.
This is not to say that even with a warrant or a consent to a complete search, a "French Connection" type of search, may be accomplished. Without specific judicial authorization for good cause shown, we do not envision the police searching with acetylene torches or otherwise destroying the utility of the vehicle. Even in a situation as the one before us where the method employed was bending the panel rather than removing two screws, if there is permanent damage to the vehicle caused by a clumsily executed search into a permissible area, the State may be responsible for the ensuing damage. But this should not vitiate the search nor cause its results to be suppressed. Readily removable portions of a car may be disturbed to determine what lies beneath. See United States v. Torres, 663 F.2d 1019 (10th Cir.1981), where pursuant to a "complete" consent search, the police removed an ashtray in the side of the door, observed some money and then removed the air-vent cover in the side of the door. Defendants argue that the Torres case is distinguishable because the ashtrays were readily removable. We do not, however, see this as a valid distinction. The door panels in this case also were readily removable without inflicting either cosmetic or utilitarian damage to the vehicle.
As we view this matter, the sole issue remaining to be determined in this case on remand is whether defendant Techera implicitly or explicitly waived his right to revoke his consent when he agreed that the search to which he had previously consented could be carried out while he waited in the holding cell. If so, we see no impediment on the facts developed below to the introduction of the cocaine as evidence.
The suppression order is reversed and this matter is remanded to the Law Division for further proceedings in accordance with this opinion.
NOTES
[1] The propriety of this initial search is not before us.
[2] Of course, if the property in which the contraband is found is the private property of the objector, different issues would have been implicated. State v. Pierce, supra. As nothing here was taken from the private property of Santana, we need not further address the impact of Techera's consent upon the search of the trunk or other portions of the vehicle in which Santana's personal property was located.