572 A.2d 1182

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JAMES C. BOUD, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted March 19, 1990—Decided April 18, 1990.

Before Judges PETRELLA, HAVEY and STERN.

*John Kaye*, Monmouth County Prosecutor, attorney for appellant (*Mark P. Stalford*, Assistant Prosecutor, of counsel).

*Wilentz, Goldman & Spitzer,* attorneys for respondent (*Charles M. Moriarty,* of counsel; *Edward D. Benattar,* on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

Defendant was charged with possession of cocaine, *N.J.S.A.* 2C:35–10.[1] After he prevailed on a motion to suppress, we granted leave to appeal.

The single issue presented is whether cocaine found in a jewelry box in defendant's bedroom must be suppressed. The cocaine was found during a burglary investigation which was conducted by police with defendant's consent. The motion judge suppressed the cocaine because defendant did not expressly consent to a search of the jewelry box. We find that no specific consent was necessary before the police could look into the box, and we reverse the suppression.

Detective Corporal Bernard Sullivan of the Wall Township Police Department was the only witness on the motion. He testified that on July 2, 1989 he, along with other officers, responded to "the call of a burglary in process." He indicated that upon arriving he "immediately came in contact with the defendant and his wife" who were "standing on the front lawn of the address" from which the call for help was placed. According to Sullivan, defendant advised him "that he had called in reference to a burglary in his home, which was on Buchanan Street," and that he and his wife had been chased "out of the home and that they had to run to" their present location. Sullivan testified that defendant appeared "very nervous" and had "a trickle of blood stringing from his nostril. He

---

[1]The order under review and caption on the State's brief refers to an indictment number. However, the procedural history in the State's brief, upon which defendant relies, contains no reference to same, and no complaint or indictment is contained in the appendix. *But see R.* 2:6–1(a).

had extremely bloodshot eyes [and was] talking in a very rapid and at times irrational manner." Defendant was described by Sullivan as

> ... very excitable. He kept looking around. He had a flashlight in his hands. He was combing the yard he was in, as well as the surrounding yards, with the flashlight. He could not stand still.

Sullivan endeavored to "calm [defendant] down, which was more or less impossible," but that

> [a]fter quite an amount of questioning, [defendant] advised that he and his wife had been in their home at 2901 Buchanan Street when burglars had entered the home and had been in the bedroom of the home.
>
> He advised that the burglars had chased him and his wife from the home. And that upon getting out of the house, the burglars were still inside and that he and his wife had run as fast as they could and then stopped at this house [where they were] on Monmouth Boulevard.

.    .    .    .    .    .    .    .

> He advised ... that they had—the burglars had been in the bedroom. And they had completed destroyed his wife's dresser in the master bedroom.

Sullivan was also advised by the owner of the home to which he had responded that she did not know the Bouds but "[s]he advised that two basically hysterical people had come to her front door, knocking on the front door, banging on the front door, asking her to call the police, at which there was a burglary, at which point she did, in fact, call the police."

Sullivan "informed the defendant that we as police officers would like to go back to the home, check out the area and the home to see if any intrusion, any burglars were still present and if any crime had been committed, basically looking for suspects and evidence of crime." According to Sullivan, "Mr. Boud responded that he was very afraid to go back into the house ... as he was afraid that someone might be there in the house, and asked us to go back to the house, check it out and make sure that everything was okay and nobody was still inside." Sullivan testified that he "advised [defendant] that we as a police officer would like to go investigate. And he advised, yes, I'm afraid. Please to go back and make sure everything's okay." The officer then proceeded to the Boud's home without

the Bouds who were "afraid to go back until we checked it out."

An external search of the premises was conducted, and the officers observed no signs of forced entry. Thereafter the officers went through the "unsecured door on the west side of the house ... and began to make an interior check" for "any suspects or evidence of a crime." The officers found the kitchen and living room to be "fairly neat and clean." They then went into the master bedroom which was off the living room, as this was "the room that the defendant had advised is where the damage had been done to his wife's dresser." After making sure "[t]here was no one in the room" the officers turned on the light and noticed that "several drawers [of the dresser] were opened. In those drawers, in plain view were articles of clothes and fireworks. There was also a box of fireworks on the floor near the closet."

As Sullivan "approached the dresser to examine it to see if it had been damaged in any way [or if there were] any signs of force, theft" he saw a jewelry box which was "directly on top of the dresser that Mr. Boud had referred to." It was a "basic small wooden or metal flip-top jewelry box."

Sullivan was asked what he did with respect to the jewelry box and responded as follows:

> Well, from past investigations of burglaries and especially in Wall Township and knowing that most residential burglars from my knowledge especially in Wall Township are removing cash and jewelry items from the burglaries that they do, [he] turned up the top of the unlocked jewelry box to see if any jewelry had been taken out of the box to substantiate a crime.
>
> In doing so, [he] found sitting on top of the jewelry in the jewelry box, upon opening the top, a white plastic McDonald's coffee stirrer spoon and a clear cellophane cigarette wrapper containing white powder that was closed off with a hairpin."

Based on his education and experience, Sullivan believed that the white powder was cocaine, and defendant and his wife were both arrested for possession of cocaine which, together with the

fireworks, were seized by the police.[2]

On cross-examination Sullivan admitted that while at the neighbor's house he did not specifically ask defendant or his wife "what jewelry you could expect to find in the jewelry box" or whether he could search the "jewelry box in particular." Sullivan also admitted that he believed, from his observation of defendant and his wife, that "they were under the influence" of some substance. When asked how observation of the jewelry box would reveal whether or not there had been a burglary, without knowing specifically what was or had been in the box, Sullivan responded:

> Well, if I'd opened the jewelry box and it had been empty or there had been perhaps something left behind by the burglar, alleged burglar, then that certainly would have told me something.

Moreover, Sullivan stated that "[t]he jewelry case was not searched incident to arrest. It was searched for evidence of a burglary."

In making his findings, the motion judge concluded that the Wall Township police had received a report of a burglary and were told by defendant and his wife "that they had seen burglars in their house." He noted that Officer Sullivan testified that "Mr. Boud specifically gave him permission to look for burglars in the house. As a matter of fact, requested them to go there and look for burglars. And that testimony is uncontroverted." He also noted that Sullivan testified that cash, fireworks and a jewelry box were observed in plain view and that Sullivan "opened the jewelry box in which there was a McDonald's spoon with a bag with white powder in it."

In granting the motion to suppress the motion judge concluded:

> I think it's important here that we look at both what the argument is and what the officer's testimony is as to why he looked into the jewelry box. He

---

[2]The record does not reflect if defendant's wife was indicted. She was not a party to the suppression hearing.

indicated that he looked into the jewelry box in order to see if there was evidence of a burglary in the jewelry box.

Now, as I think it's also important to note here that essentially what the State is arguing is that this was a consent search and that the scope of the consent included or encompassed the contents of the jewelry box.

Therefore, we're not being called on to decide whether an argument could have been made for a search of the jewelry box at that point under an Emergent Circumstances Doctrine. This is not a situation where the officer has testified that he became suspicious that there were drugs involved because of the behaviour of the defendants, that he suspected drugs were in the box.

.    .    .    .    .    .    .    .

His testimony was that he was not looking for drugs in the box. He was looking for contents of a burglary. ...

There's no question based on the testimony that we have and the fact that it's uncontroverted that there was consent to go into the house and look for burglars. But it does not appear to go any farther than that.

Certainly anything that could be found in a search for burglars, even if, you know, resulted in evidence of a different crime could, in fact, be used.

But the issue then becomes could the scope of that consent be held to include the contents of the jewelry box either directly or by implication. And I don't see that.

## The judge then developed his reasons for suppressing the contents of the jewelry box:

If the officer's real concern was that the jewelry box might produce evidence of a burglary, the proper course of action would be to go back outside and say, Mr. Boud, I want to look in the jewelry box to see if there's evidence of a burglary in there. Can we have permission to look in there. And [he'd] say yes or no. And if he said yes, it would be a whole different story. If he said no, we might reach the second question, which is not before us now, which is whether there would have been emergent circumstances for the search for drugs at that point.

... All the motion asked is to suppress all evidence seized as a result of the search. And as I indicated before, most of the search was with permission.

Therefore, anything found outside of the jewelry box was within the scope of the consent, including the cash, the fireworks, the Preparation H. All of those things were within the scope of the consent.[3]

---

[3]The facts concerning when and where the Preparation H was found were not developed, although defendant argued that the finding of Preparation H supported his contention that the officers "were looking for evidence of drug use ... [and] formed an opinion that defendant and his wife were under the influence of drugs." Detective Sullivan testified that Preparation H "can be suspicious depending upon its location in the home." The trial judge made no

> But as to the contents of the jewelry box only, they appear to go beyond the scope of the consent. And, therefore, an order will be entered suppressing the contents of the jewelry box only.

Therefore, the cocaine found within the box was suppressed.

We believe that the actions of Detective Sullivan and the other police officers while in the Boud house were "reasonable." We do not believe, having been given consent to enter the home of the Bouds to search for burglars and for evidence of a burglary, that it was necessary to obtain specific consent to look inside the jewelry box found in plain view. The police were investigating a burglary, and whether items were taken from that jewelry box was highly relevant to the very reason they were asked to investigate. If nothing was in the box, the police could have taken immediate action in furtherance of their investigation for burglars in the vicinity. Their conduct could have been substantially affected by what was or was not found to be in the jewelry box, in response to a report of a burglary in that bedroom. While constitutional values are at stake, the conduct of police officers in these circumstances should not turn on the niceties relating to the scope of a consensual search when individuals, claiming to be victims of crime, specifically ask the police to enter their home in order to investigate.

■■ It is, of course, fundamental that consent to search must be voluntary under the totality of circumstances. *See e.g., Schneckloth v. Bustamonte,* 412 *U.S.* 218, 93 *S.Ct.* 2041, 36 *L.Ed.*2d 854 (1973). Moreover, under our State Constitution, *Const.* 1947, Art. I, Par. 7, waiver of the warrant requirement is valid only if the individual giving consent has knowledge of his right to refuse. As our Supreme Court has said, "[u]nder Art. I, par. 7 of our State Constitution the validity of a consent to a search, even in a non-custodial situation, must be measured in terms of waiver; *i.e.,* where the State seeks to justify a

---

specific findings with respect to the Preparation H and attached no particular significance to its discovery.

search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." *State v. Johnson,* 68 *N.J.* 349, 353–354, 346 *A.*2d 66 (1975). As the court further said in *Johnson:*

> Unless it is shown by the State that the person involved knew that he had the right to refuse to accede to such a request, his assenting to the search is not meaningful. One cannot be held to have waived a right if he was unaware of its existence.
>
> However, in a non-custodial situation, such as here presented, the police would not necessarily be required to advise the person of his right to refuse to consent to the search. Our decision is only that in such a situation if the State seeks to rely on consent as the basis for a search, it has the burden of demonstrating knowledge on the part of the person involved that he had a choice in the matter. [60 *N.J.* at 354, 346 *A.*2d 66].

We are not necessarily dealing with a "search" or a "consent search" in the traditional sense. In any event, we are satisfied that police officers, in response to advice from victims of a crime that a burglary has just occurred or is ongoing, need not stop to ask the victims if they understand they have a right to prevent the police from entering their home to investigate the very allegations they have just reported. This is particularly true where, as here, the police officers were expressly asked by the homeowner to investigate the reported burglary. *Cf. State v. Santana,* 215 *N.J.Super.* 63, 73, 521 *A.*2d 346 (App.Div.1987), ("[n]otwithstanding *Johnson,* so long as defendant agreed to ... isolation from the site of the search, no explicit waiver or notice to defendant of a continuous right to revoke his consent was necessary.") *See also id.* at 73–75, 521 *A.*2d 346 (scope of consent search).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated ...," and our State Constitution provides precisely the same. There is nothing objectively unreasonable about the conduct of the police in this case. *State v. Bruzzese,* 94 *N.J.* 210, 219–223,

463 *A*.2d 320 (1983) *cert.* den. 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). Hence, the motion to suppress was improperly granted.

The police have always been able to enter a dwelling without a warrant to render assistance in times of emergency. *See* 2 LaFave, *Search & Seizure* (2d ed.1987), Sec. 6.6(a). As then Circuit Judge Burger stated as a single member of the United States Court of Appeals for the District of Columbia Circuit in *Wayne v. United States,* 318 *F.*2d 205, 212 (D.C.Cir.1963) *cert.* den. 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963), "... the business of policemen ... is *to act,* not to speculate or meditate on whether the report [of an emergency] is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (emphasis in original.) Police officers must react to "the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences." LaFave, *supra* at 698.

■■ Similarly, "[p]olice may also enter private property for the purpose of protecting the property of the owner or occupant or some other person." *Id.* at 706. As noted by Professor LaFave, "[o]ne possibility is where the police reasonably believe that the premises have recently been or are being burglarized." *Id.* at 706–707. Of course, while the police must act reasonably and the courts must be "vigilant in guarding against subterfuge, that is, a false reliance upon the property protection rationale when the real purpose was to seek out evidence of crime," at 708, here the police were reacting to a report by the homeowners themselves, who advised that burglars were then in their house.[4] When the police act reasonably in response to

---

[4]There was no finding that the police were using a subterfuge or acting in bad faith.

a report of burglary, they may enter the premises to investigate, particularly when the owners request that they do so. Further, "[a]ssuming the police are lawfully on the premises for the purpose of protecting property, they may take appropriate steps consistent with that purpose." LaFave, *supra*, at 709.[5]

Under the totality of circumstances noted, the trial judge erroneously granted the motion to suppress. Accordingly, we reverse and remand for further proceedings.

---

[5]Moreover, having invited the police to investigate the burglary in his home, defendant had no reasonable expectation of privacy with respect to a search of the jewelry box. *Cf. United States v. Jacobsen,* 466 *U.S.* 109, 119–126, 104 *S.Ct.* 1652, 1659–1663, 80 *L.Ed.*2d 85, 97–102 (1984); *Illinois v. Andreas,* 463 *U.S.* 765, 772–773, 103 *S.Ct.* 3319, 3324–3325, 77 *L.Ed.*2d 1003, 1011 (1983).

