841 A.2d 420 (2004)
366 N.J. Super. 307
STATE of New Jersey, Plaintiff-Respondent,
v.
Douglas FARMER, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 2003.
Decided January 28, 2004.
*421 Andrew P. Slowinski, Designated Counsel, Newark, argued the cause for appellant (Yvonne Smith Segars, Public Defender, *422 attorney; Mr. Slowinski, of counsel and on the brief).
Deborah Bartolomey, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Ms. Bartolomey, of counsel and on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and PAYNE.
The opinion of the court was delivered by STERN, P.J.A.D.
Defendant was convicted of possession of heroin and/or cocaine, N.J.S.A. 2C:35-10 (count one), and possession with intent to distribute heroin, N.J.S.A. 2C:35-5a and 5b (count two). The trial judge merged the two counts and sentenced defendant to five years in the custody of the Commissioner of Corrections consecutive to a sentence he was then serving. On this appeal defendant argues that (1) the trial judge should have declared a mistrial after discovering that a deliberating juror was a "convicted felon who the trial judge himself had previously sentenced to prison," (2) the trial judge "impermissibly intruded on the deliberations of the jury," (3) "the State failed to meet its burden to prove that the consent to search defendant's residence was obtained from an authorized third party," (4) and did not prove that the consent to search was "voluntarily given," (5) "the police lacked articulable suspicion necessary to justify their request to enter defendant's residence," (6) the motion to suppress should have been granted because of the "warrantless search without probable cause," (7) the evidence was "insufficient as a matter of law to support a verdict based on constructive possession," (8) the sentence "should be vacated" because of the judge's failure to find mitigating factors, and (9) defendant's sentence was "unduly harsh and was based on double counting of an aggravating factor."
Our careful review of the record convinces us that these contentions are clearly without merit and warrant only the following discussion. R. 2:11-3(e)(2).

I.
The proofs adduced at trial revealed that on October 22, 1997, at approximately 3:30 p.m., Detective Jeffrey Carrier of the Plainfield Narcotics Division was "driving a marked police car" eastbound on the 600 block of West Third Street in Plainfield. His partner, Officer Tuwana Marshall, was also in the vehicle. As Officer Carrier passed a driveway between 233 and 235 Muhlenberg Place, in a "high narcotic location," he observed defendant "on his knees reaching up into a basement window."
According to Detective Carrier, defendant's arm was "all the way up to his shoulder," reaching up in an upward direction. Carrier believed that the individual "may have been going to a stash" of narcotics in the basement. The observation was made from approximately seventy-five to 100 feet away while traveling at approximately twenty-five to thirty miles per hour as he drove past the site.
After observing defendant, Detective Carrier made a "U-turn as quick[ly] as possible," and drove up to the driveway between 233 and 235 Muhlenberg Place. Upon entering the driveway, defendant "started to run." Carrier noted that the individual was wearing a "rust-colored leather jacket, with dark pants."
Detective Carrier saw defendant enter the back door of the house at 652 West Third Street. Carrier followed him but the door was locked. Carrier radioed for backup and directed Officer Marshall "to go to the front of the house to make sure nobody runs out."
*423 Thereafter, Detective Carrier "knocked on the door" that defendant had entered. A female answered and, after a conversation, Carrier entered the "common hallway" between the two apartments, and proceeded to "the door that led to the second-floor apartment." He knocked thereon, and spoke with another female who answered that door. Carrier advised the woman that "it is possible that someone just ran up into her apartment," and Carrier entered the apartment with her permission, to investigate.
While climbing the stairs to the apartment, Carrier observed defendant in the bedroom playing a video game. Carrier also observed that defendant was no longer wearing the rust-colored coat, but saw the coat "over the back of a couch." Then Carrier "checked" the jacket and "frisked" defendant for weapons but did not go into his pockets or find any incriminating evidence.
Thereafter, Detective Carrier had defendant "come with" him and had Detective Edward Hafeken go to the basement window where Carrier had first observed the defendant. Hafeken reached in the window and "came down with a handful of suspected drugs." The narcotics seized from the window were found to be eleven vials of cocaine and four folds of heroin. The defendant was then placed under arrest and transported to police headquarters "for processing."
Officer Marshall and Detective Hafeken corroborated Carrier's testimony in terms of what occurred outside the building. Thereafter, Detective Christopher Gulbin testified as an expert about the purpose of a "stash," and in response to a hypothetical question, stated that the drugs were "possessed ... with intent to distribute."
Defendant testified on his own behalf, and stated that at the time Carrier observed him, he was "tying [his] boot" in the driveway while "talking to his next door neighbor." The defendant testified that he "jogged away" from the police because if the police "stopped and started searching" him, they would plant drugs on him because he was in a "heavy drug narcotics" area, and he feared being found in violation of his parole and "sent back" to prison. However, the defendant claimed that he was not selling drugs on the day in question and did not reach into the apartment basement window.

II.
A warrantless search of a home is presumptively unreasonable and illegal, and will be justified only if it falls within one of the exceptions to the warrant requirement of the Fourth Amendment and Article I, paragraph 7, of our State Constitution. See, e.g., State v. Bolte, 115 N.J. 579, 585, 560 A.2d 644, 648 cert. denied, 493 U.S. 936, 110 S.Ct. 330, 107 L.Ed.2d 320 (1989); State v. Valencia, 93 N.J. 126, 133, 459 A.2d 1149, 1152 (1983); State v. Whittington, 142 N.J.Super. 45, 51-52, 359 A.2d 881, 884-85 (App.Div.1976). The burden is on the State to establish that the search is justified under one of the exceptions to the warrant requirement. Ibid. Consent, however, is a well-recognized exception to the warrant requirement. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Maristany, 133 N.J. 299, 305, 627 A.2d 1066, 1069 (1993). And "consent may be obtained from the person whose property is to be searched, from a third party who possesses common authority over the property, or from a third party whom the police reasonably believe has authority to consent." State v. Maristany, supra, 133 N.J. at 305, 627 A.2d at 1069 (citations omitted).
*424 Detective Carrier testified at the motion to suppress that, after being permitted to walk through the first woman's apartment to "the common hallway," he knocked on the door leading to the upstairs apartment. He advised the female who responded "that an individual just ran" into the building but did not exit. She responded that "there's no one home, but I'm here with my mother and some children." Carrier then asked if he "could take a look upstairs, and she said sure." He testified that, like the woman who led him to the common hallway, the female was being "cooperative."
There is no testimony about the woman's relationship to the apartment, but no evidence suggests that she did not live there or have authority to consent to the entry. To the contrary, the fact that her mother was present and there were children there suggests she was a resident.[1] In any event, it is "appearances of control" at the time of the search, "not any subsequent resolution of questions of title or property rights," that must be used to assess the validity of the officer's search. State v. Santana, 215 N.J.Super. 63, 71, 521 A.2d 346, 350 (App.Div.1987).
In his extensive oral opinion denying the motion to suppress, Judge Walter Barisonek concluded:
Here I find that the police knew this person did not have authority to run through the first-floor apartment. He had to be upstairs. A woman comes to the door, says my children are upstairs and my mother [is] upstairs. It certainly would be reasonable for them objectively to assume that she had control over those premises, and lived in those premises, and had authority to allow the police to enter. So in terms of a consent there is nothat is a lawful consent....
There is no basis in the record on which we can disturb Judge Barisonek's conclusion that it was reasonable under the circumstances for Detective Carrier to believe that the female who answered the door had control over the premises and authority to consent to his entry after he observed an individual, not known to be a resident, run into the building.
Defendant additionally claims that the State did not prove that the female was aware of her right to refuse consent. As defendant argues, our Supreme Court has held that "the State has the burden of showing that consent was voluntary, an essential element of which is knowledge of the right to refuse consent." State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66, 68 (1975). However, "Johnson does not compel the police to specifically advise the property owner [or person in possession of the premises] of the affirmative right to refuse an inspection." State v. Brown, 282 N.J.Super. 538, 548, 660 A.2d 1221, 1226 (App.Div.), certif. denied, 143 N.J. 322, 670 A.2d 1064 (1995). In Brown, the superintendent of a building consented to the search of a porter's room where incriminating evidence was discovered. Id. at 544, 660 A.2d at 1224. There we held that the consent by the superintendent was not affected by the police's failure to inform him of his right to refuse. Id. at 547-48, 660 A.2d at 1225-26. Moreover, there, as here, the third party giving consent was "extremely cooperative with the police" and there was no suggestion he would have declined consent if he were advised of that right. Id. at 548, 660 A.2d at 1226.
We add that motions to suppress relate to physical evidence, see, e.g., State *425 v. Robinson, 224 N.J.Super. 495, 499-501, 540 A.2d 1313, 1315-16 (App.Div.1988); State v. Keegan, 188 N.J.Super. 471, 475, 457 A.2d 1205, 1207 (App.Div.), certif. denied, 93 N.J. 320, 460 A.2d 710 (1983), and significantly, at the motion to suppress, the only physical evidence defendant sought to exclude was the jacket found in the apartment that defendant was wearing when observed at the scene of the stash.[2] There was no challenge to the admissibility of the drugs, and we conclude, irrespective of whether the defendant could otherwise now challenge the admission of the drugs themselves, that there was no basis to exclude their admission. See State v. Ford, 278 N.J.Super. 351, 356-57, 651 A.2d 103, 106-07 (App.Div.1995) (plain view observation of defendant reaching hand into exterior portion of a window; stash located therein deemed admissible over dissent). See also State v. Johnson, 171 N.J. 192, 209-10, 793 A.2d 619, 629-30 (2002) (drugs found after defendant observed placing object in hole beside a post on the porch of a multi-family house held admissible); State v. Linton, 356 N.J.Super. 255, 258-59, 812 A.2d 382, 384-85 (App.Div.2002) (no expectation of privacy in someone else's building).

III.
Defendant asserts that the trial judge should have granted a mistrial after it was discovered a juror, J.M., had been convicted of indictable offenses and sentenced by the trial judge. Defendant contends that the denial of a mistrial violated his federal and state constitutional right to a fair and impartial jury, and entitles him to a new trial.
During deliberations, court personnel recognized the juror or his name, and, after investigation, the judge confirmed that J.M. had three or four "indictable convictions" and previously had been sentenced by him on a drug-related charge. Both parties agreed that the juror was disqualified and had to be removed from jury service. See N.J.S.A. 2B:20-1(e). The juror was questioned by the judge and stated that he did not discuss "his prior convictions" or "involvement with law enforcement" with the other jurors. The judge then indicated that he would "bring out each juror individually and make sure this jury in no way, shape or form has been tainted based on any discussions they may have had." Defendant nevertheless moved for a mistrial, but the judge indicated any such application should abide the jury voir dire.[3]
Four jurors indicated that J.M. told the panel that he observed a friend or third party placed under arrest, and "frisked" or "searched." No juror indicated that J.M. *426 felt the law was, or should be, different than the judge explained, or should not be followed, or that J.M. said anything about his personal experience with drugs or with the police.
One juror did report:
MS. [M.]: I kind of felt it washis behavior was contradictory to your instructions.
THE COURT: Okay.
Did he ever give you any personal examples, personal history or experiences that he may have had in life, either through him directly or somebody he may have been with or friends concerning being stopped by the police and, you know, or frisked or anything like that?
MS. [M.]: Generally, yes.
THE COURT: Generally.
MS. [M.]: In his own way.
THE COURT: Did he indicate how that personal experience and how it came to, you know, how did it come about that it involved him, did it involve somebody else? Do you remember?
MS. [M.]: Just the fact that he lived in Plainfield and he saw this happen to people and he knew, that he observed this happening. He knows how the police behave in Plainfield. He just said he knew a lot about it.
THE COURT: Okay. But did he ever describe anything to himself personally, that [ ] personally involved him with the police?
MS. [M.] That had happened to him?
THE COURT: Happened to him, yeah.
MS. [M.]: Gosh, I can't remember that.
THE COURT: Okay.
....
MS. [M.]: No, but I'd like to back step and answer your previous question.
THE COURT: Okay.
MS. [M.]: He did make personal reference to himself because I offered a rebuttal to it.
THE COURT: What did he say happened to him personally?
MS. [M.]: Bad experiences with the police department that has he been stopped for no good reason and stuff like that.
THE COURT: Kind of like hassle type things.
MS. [M.]: Hassle type. I offered thein
No juror specifically indicated J.M. said anything that would affect the juror's ability to be "fair and impartial." At the conclusion of the voir dire, defense counsel did not "wish to be heard," and the judge concluded:
All right. I did an individual voir dire. Obviously [J.M.] was drawing on experiences that he did have personally, but at least he did not express that to the jurors, and even though there is a diversion as to what was heard by various jurors. In other words some of them said, I didn't hear this, some of them did. I don't know if that's because they weren't paying attention, they weren't listening to him they were talking to somebody else, but, I think, you get a gist of what was going on with Mr. [M.]. He was talking about a potential, maybe minorities being treated unfairly because of police stops and not just minorities, people being treated unfairly with stops and frisks and things of that fashion. He certainly has every right in the world to question the application of the facts to the law, and I didn't hear any inference made by this jury where he said, you know, you shouldn't follow what the judge says. He had a right to *427 express his opinions concerning the application, as I said, of the facts to the law.
....
... the last two jurors indicated they overheard the conversations. So a couple of the jurors indicated that they didn't hear any references to personal experience, but, I think, the overall theme was he did interject personal experiences, which he really should not have done. He violated what I told all the jurors in terms of deliberations and decid[ing] the case based on the facts, not based on your personal experience as it relates to police behavior and anything else. I didn't get that specific, but that's what I meant, and we excuse jurors []because they feltsome felt good about police, some felt they weren't any good, and I gave instructions to the jury about that's not how this is done. It has to be done based on the evidence fairly and impartially, but he never referenced anything happening to him personally, and I'm finding that based on the conversations with these jurors what he was referencing, he made it seem like it was always somebody elsenot always. It was he was with somebody else who was adversely affected as a result of police conduct.
So I'm finding at this point that there is no taint to this jury. He's been removed. We have two alternates. The alternates have not been a party to any of those discussions because they're not part of the deliberating jury, and I am going to put in one of the alternates.
The trial judge thereafter advised counsel what he would tell the jury, and without objection instructed:
THE COURT: I mentioned to you when I gave you my instructions, my charge, that it happens that things occur during the course of a trial we have to excuse a jur[or]. You saw it first hand. Remember when I told you howwhy we have 14 jurors as opposed to 12. It happened in this case. So what we are going to do now is substitute one of the alternates for Juror No. 8, Mr. [M.]. [The name of the alternate was drawn.]
....
I'm going to give everybody further instructions at this point, and you have to follow what I'm telling you now even though you may not like it. Okay.
As you know Juror No. 8, Mr. [M.] has been excused from this jury. Miss [C.] as an alternate juror has been selected to take his place. Because of this change in the composition of the jury, you must set aside and disregard all of your deliberations up to this point and begin your deliberations again, just as if you are entering into that jury room after listening to my charge. In other words, all deliberations, all discussions that you previously had, have to be disregarded and you have to start your discussions anew.
In beginning your deliberations again you must eliminate any impact that Mr. [M.], Juror No. 8, may have had on your deliberations and consider the evidence in the context of a full and complete deliberation with the new member of your jury. Let me just give you a little example so you understand what I'm talking about.
It's as if all of you are starting fresh, right after I finished my charge. So you can't say we talked about that already and what we said applies. You can't use your discussions or deliberations. Again, you have to start anew as if it's a whole panel just starting out.
Any objection to the recharge?
MR. HENN: No, Your Honor.
MR. SHIARELLA: No, Judge.
*428 The jury is presumed to adhere to instructions, and we must assume the jury followed that mandate. See State v. Cooper, 151 N.J. 326, 370, 700 A.2d 306, 327 (1997), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000); State v. Winter, 96 N.J. 640, 648-49, 477 A.2d 323, 327-28 (1984).
R. 1:8-2(d)(1) provides in relevant part, that:
If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.
Discharge of a juror during deliberations is permitted only for reasons that are "personal" to the juror in question, and that do not relate to "the juror's interaction with the other jury members" or with the deliberative process. State v. Valenzuela, 136 N.J. 458, 472-73, 643 A.2d 582, 589-90 (1994). See also, e.g., State v. Jenkins, 365 N.J.Super. 18, 837 A.2d 1125 (App.Div.2003). In this case, the juror's statutory disqualification required his discharge, and the trial judge, after questioning the remaining jurors, concluded that his interaction with the jury did not taint the jury deliberations. His conclusion, based on a fair evaluation of a thorough voir dire, is entitled to deference. State v. Valenzuela, supra, 136 N.J. at 472, 643 A.2d at 589. In fact, defense counsel at the time did not suggest the contrary.
The real question before us is whether a mistrial was required because here the excused juror was disqualified and should not have been seated in the first place. While there is some merit to that position, its application would undermine the significance and jurisprudence relating to R. 1:8-2. Defendant does not point to any specific or actual prejudice based on the juror's initial participation, and we therefore see no basis for treating this case differently from others involving jurors discharged for purely personal reasons, merely because the discharged juror was disqualified. In fact, as the Supreme Court found no basis to reverse a death penalty conviction when a juror lied or gave inadequate information during voir dire and even deprived defendant of the ability to exercise a peremptory challenge, there can be no reversal here.[4]See State v. Cooper, supra, 151 N.J. at 347-51, 700 A.2d at 315-18. Compare State v. Williams, 190 N.J.Super. 111, 462 A.2d 182 (App.Div.1983), where the disqualified juror had remained on the panel until the verdict was rendered.
It is well settled that "substitution of an alternate juror during deliberation does not in and of itself offend a defendant's guarantee of a trial by jury." State v. Williams, 171 N.J. 151, 162, 793 A.2d 594, 601 (2002). And here the discharge had nothing to do with the "juror bias, outside influences, or problems arising in the interaction between jurors." State v. Adams, 320 N.J.Super. 360, 367, 727 A.2d 468, 471 (App.Div.1999). Moreover, the judge ensured that the jury had not been tainted or prejudiced by interviewing each juror, separately, and ensuring that each could be fair and impartial. Accordingly, we cannot say the judge abused his discretion by denying a mistrial.
*429 It is true that we have held that a mistrial was the appropriate remedy where a juror was excused after it was learned that he had been convicted of an offense at age fifteen in North Carolina. State v. Harvey, 318 N.J.Super. 167, 173-75, 723 A.2d 107, 109-11 (App.Div.1999). But there, a "rap sheet" check was done after the juror was observed, by the prosecutor's investigator, "making facial gestures" as if he disbelieved the testimony of a rebuttal witness, id. at 173, 723 A.2d at 110, the juror was removed "during the second day of deliberations after the jury reported 11-1 deadlock," and the removal "was triggered by the State's perception that he might be an unfavorable juror." Id. at 174, 723 A.2d at 110. Here, the discharge was required by statute.

IV.
The judgment of conviction is affirmed.
PAYNE, J.A.D., concurring.
I concur with the result reached in this case. However, in doing so, I am mindful of a line of cases that hold that omission or falsification of information by a juror during voir dire will constitute grounds for reversal of a conviction without a showing of prejudice if it can be shown that a peremptory challenge would have been utilized to excuse the juror. See e.g., State v. Cooper, 151 N.J. 326, 349, 700 A.2d 306, 316-17 (1997), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000); In re Kozlov, 79 N.J. 232, 239, 398 A.2d 882, 885 (1979); Wright v. Bernstein, 23 N.J. 284, 293-96, 129 A.2d 19, 24-26 (1957); State v. Scher, 278 N.J.Super. 249, 262-68, 650 A.2d 1012, 1018-21 (App.Div.1994), certif. denied, 140 N.J. 276, 658 A.2d 299 (1995); State v. Thompson, 142 N.J.Super. 274, 280-82, 361 A.2d 104, 107-08. We recognized the same principle in State v. Williams, 190 N.J.Super. 111, 115-17, 462 A.2d 182, 184-86 (App.Div.1983), a case in which the parties were deprived of their right to challenge a juror for cause as the result of her prior conviction of a crime. The fundamental concern in these cases is that:
"[w]here a juror on voir dire fails to disclose potentially prejudicial material... a party may be regarded as having been denied a fair trial." [Kozlov, supra, 79 N.J. at 239, 398 A.2d 882[, 885].] The [Kozlov] Court explained that "[t]his is not necessarily because of any actual or provable prejudice to his case attributable to such juror, but rather because of his loss, by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge, thus assuring with maximum possible certainty that he be judged fairly by an impartial jury." Ibid.; see also State v. Deatore, 70 N.J. 100, 105-08, 358 A.2d 163, 166-68 (1976).
[Scher, supra, 278 N.J.Super. at 264, 650 A.2d at 1019.]
However, in each of the cases in which a reversal occurred, the "tainted" juror participated throughout the course of jury deliberations and in rendering a verdict. In the present case, such did not occur. J.M.'s identity as a convicted criminal was discovered before a verdict had been reached.
A juror is disqualified from service following conviction of a crime because the juror is untrustworthy. See comments to N.J.S.A. 2A:69-1 (repealed) and N.J.S.A. 2B:20-1. That untrustworthiness diminishes the jury's fairness and impartiality, as constitutionally guaranteed. An argument can be made that J.M.'s mere presence throughout the course of trial was sufficient to render the verdict in this case infirm, even if J.M. did not participate in rendering that verdict. If a searching voir dire of the remaining jurors had not occurred, *430 if an alternate juror had not been available, or if the newly-constituted jury had not been properly instructed to commence their deliberations anew, I might accept this argument. However, the necessary inquiry took place, and it disclosed no impairment of the jury's fairness and impartiality. An alternate was available, and the jury was properly instructed. Under these unusual circumstances, I can find no principled basis for reversal of defendant's conviction based upon actual or presumptive denial of defendant's right to a fair trial.
Additionally, I recognize that, as the result of the parties' and the court's inability to establish a basis for a challenge for cause during the course of voir dire, the composition of the jury differed from that which would have existed had J.M. been challenged for cause and removed from the jury panel. An additional and presently unknown person would have been selected to serve on the jury, and, following the selection of alternates, may have served as a deliberating juror. However, case law suggests no basis for finding a constitutional deprivation in this context. Cf. United States v. Martinez-Salazar, 528 U.S. 304, 317, 120 S.Ct. 774, 782, 145 L.Ed.2d 792, 804 (2000); Ross v. Oklahoma, 487 U.S. 81, 91, 108 S.Ct. 2273, 2279-80, 101 L.Ed.2d 80, 91 (1988).
NOTES
[1] Although relying on the judge's findings in defending the denial of the motion to suppress, the statement of facts in the State's brief does not recite the testimony from the motion to suppress. Only Detective Carrier testified at that motion, and his credibility was not challenged.
[2] Defendant also asked "that there can be no testimony from the police at the trial before the jury about finding the jacket and arresting the defendant." We recognize that the identification of defendant and his arrest followed the entry into the apartment. However, if the entry were valid, as we conclude, there was a basis for the detention for the short period before the drugs were recovered and the arrest perfected, as Judge Barisonek concluded. See State v. Stovall, 170 N.J. 346, 356, 788 A.2d 746, 752 (2002); State v. Citarella, 154 N.J. 272, 281, 712 A.2d 1096, 1100 (1998).
[3] As counsel did not have to be in court during the deliberations and defendant's attorney called in sick, defendant was represented by another Public Defender when the judge placed on the record what was reported and discovered, and his intention to interview the jury. This was done after both the judge and the office associate spoke with defense counsel by phone. The jury was excused until 1:45 p.m. when defense counsel indicated he could be present. The voir dire was conducted in his presence, and he did not repeat the request for a mistrial.
[4] We were not presented with a transcript of the jury selection.