22 A.3d 77

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. DEREK J. KALTNER, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted June 1, 2011—Decided June 29, 2011.

Before Judges PARRILLO, ESPINOSA and SKILLMAN.

*Peter E. Warshaw, Jr.*, Monmouth County Prosecutor, attorney for appellant (*Ian D. Brater*, Assistant Prosecutor, of counsel and on the brief).

*Yvonne Smith Segars*, Public Defender, attorney for respondent (*Frank J. Pugliese*, Assistant Deputy Public Defender, of counsel and on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

We granted the State leave to appeal from the Law Division's order suppressing evidence of drugs seized from the third floor bedroom of defendant Derek Kaltner. For the following reasons, we affirm.

According to the State's proofs, towards the end of September 2009, defendant and four other men, all Monmouth University students and at least two of whom were fraternity brothers, rented an off-campus home located in a residential neighborhood of Long Branch. The following month, on the evening of October 22, 2009, their home was host to a large party, resulting in a noise complaint to Long Branch Police.

The City of Long Branch has a noise ordinance, which provides:
It shall be unlawful for any person to make, continue or cause to be made or continued any loud, unnecessary or unusual noise or any noise which endangers the health, safety or welfare of the community or which annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others nearby or near to or upon a public highway, road, street, lane, alley, park residence, square or common whereby the public peace is broken or disturbed or exceeds the sound pressure levels enumerated in § 235-4.

[*Long Branch, N.J., Code* § 235-1 (2010).]

According to Long Branch Police Officer Ramon Camacho, upon responding to noise complaints, police typically knock on the door of the offending residence, speak with the responsible resident, and direct that individual to comply with the noise ordinance by issuing either a verbal warning or written summons. In fact, this was not the first time Camacho had been dispatched to the residence at 741 Westwood Avenue. Earlier that month, Camacho had responded to complaints of a loud party at the home and warned one of defendant's housemates to abate the noise or a summons would issue for violating the city's noise ordinance.

On the present occasion, Camacho and four other officers arrived at the residence at 2:15 a.m. on October 23, 2009. Three of the officers, including Camacho, were in plain clothes as part of the Street Crimes Unit (SCU), which focuses on quality of life issues such as noise and underage drinking. Hearing loud noise

emanating from the home, Camacho knocked on the front door. Within a minute, an unidentified male opened the door to allow the officers entry, but walked away before the officers could speak with him. Upon entering the home, Camacho observed "a sea of people crowded everywhere" drinking beer and talking loudly with beer cans and plastic cups thrown about. While some were clearly intoxicated, none appeared to need medical assistance or any emergency aid. In an attempt to locate the responsible residents, the officers repeatedly shouted, "who lives here?" but none of the partygoers responded.

Officer Camacho estimated that between 120 and 150 people were present throughout the residence, including the basement and upper floors. Upon police arrival, partygoers began "flushing out of the house." Camacho did not recognize the resident to whom he had spoken when responding to a noise complaint on the earlier occasion.

When none of the people inside the home answered the police request that the residents come forward, the officers separated and canvassed the residence. According to Camacho, their purpose was to identify and locate the residents in order to clear out the party, abate the noise and ensure that no individual was in need of medical assistance, even though there were no reports of anyone in need of assistance or in physical distress.

Believing that there were numerous individuals on the upper floors, Camacho proceeded alone to the second floor, shouting "who lives here?" along the way. While in the second floor hallway, Camacho approached more partygoers, asking each of them whether he or she was a resident. None of those individuals acknowledged being a resident of the home.

Finding no residents, Camacho proceeded to the third floor where he found defendant's bedroom door open. Camacho peered into the bedroom from the hallway to see if anyone was hiding inside. From the hallway, Camacho observed two green, star-shaped pills with no markings in small plastic bags, sitting in plain view atop a small table in defendant's bedroom about six feet away

from the hallway. Based on his training and experience, Camacho suspected the pills were a "controlled substance," which were, in fact, later identified as ecstasy.[1] Next to the pills, he observed a prescription pill bottle, twenty-three empty plastic bags, and a black digital scale covered with white powder residue. Camacho then entered the bedroom where he located additional pills inside the pill bottle with defendant's name on the label. Camacho also observed defendant's identification cards sitting on the table near the pills. Camacho seized these items and returned downstairs to find the other officers.

Meanwhile, unbeknownst to Camacho, within five to ten minutes of entering the home, the other officers located three residents, none of whom was defendant, who at the time was at his parent's home in Rochelle Park. The officers issued summonses to those residents for violating the city's noise ordinance. One of the residents called defendant, who returned home, where he was arrested and charged with possession of a controlled dangerous substance.

The defense offered a different version of the police encounter. According to Anthony Guimmarra, one of the residents and host of the party, no more than twenty people attended the event, several of whom were not personally invited, but had mutual friends who treated the home as their own. Guimmarra was on the first floor when he heard knocking at the front door. Suspecting the police, he went upstairs to his second-floor bedroom, where he peered out the window and observed police at the front door. Guimmarra returned downstairs and opened the front door, but noticed that the officer who had been knocking was walking back toward his patrol car. When Guimmarra walked outside to confront the officer, he observed other officers entering the house through the garage and walking around to the back door. According to

---

[1] "Ecstasy" is a "controlled dangerous substance, also known as MDMA, or, methylenedioxide methamphetemine." *State v. One 1994 Thunderbird*, 349 *N.J.Super.* 352, 357 n. 3, 793 *A.2d* 792 (App.Div.2002).

Guimmarra, the officers searched the entire house and kicked down the doors to several of the upstairs bedrooms, including defendant's room, where drugs were observed lying on the table.

Brian Gallina, a childhood friend of defendant and fellow student at Monmouth University, estimated a large turnout at the October 23 party at defendant's residence. Upon arrival, Gallina entered the home and proceeded to the third floor to put his coat in defendant's bedroom. Finding defendant's bedroom door closed and locked, Gallina walked down to the second floor bedroom of John Delsaro where he encountered other partygoers. Approximately thirty minutes later, Gallina was still in Delsaro's bedroom when Delsaro entered, advising Gallina and the others that police had arrived, closing and locking his bedroom door, turning off the lights and instructing everyone in the room to keep quiet. Gallina heard the officers shouting for people to come out of the bedrooms, but no one in Delsaro's room answered those calls. Gallina observed the door knob jiggle, then heard two crashing sounds at the door, which flung open. Camacho entered, reviewed everyone's identification, and exited the room. According to Gallina, Camacho then broke into an adjacent bedroom.

At the close of evidence, the motion judge made certain credibility determinations to which we defer, *State v. Elders*, 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007), and certain factual findings that are supported by substantial credible evidence in the record. *State v. Mann*, 203 *N.J.* 328, 336 (2010); *State v. Johnson*, 116 *N.J.* 99, 102, 561 *A.*2d 243 (1989); *State v. Elkwisni*, 384 *N.J.Super.* 351, 366, 894 *A.*2d 1180 (App.Div.), *certif. denied*, 187 *N.J.* 492, 901 *A.*2d 955 (2006), *aff'd*, 190 *N.J.* 169, 919 *A.*2d 122 (2007). First, the judge credited the testimony of Officer Camacho as to the "size and scope" of the party and "[t]he volume of the voices that were there." The judge also found that the unidentified adult male who answered the door invited the police inside, at least into "the common area of the home." Then, distinguishing between consent to enter the premises and consent to search inside, the

judge concluded that the police officers unlawfully extended their search beyond entry into the first floor main living area:

> Once the police were in the home, however, I do not believe that [the State] ha[s] come forward ... to show any factual basis for [the officers'] continued search of the property. Their right to be in the property and their purpose for being in the property was accomplished once they were in the living room. They demanded that the owners come forward. And I agree with [defense counsel] that there's a substantial question about how much time elapsed in their effort to locate the owner in a way other than physically intruding upon other areas of the home. Certainly, they could have made demands of the other individuals to go—either to identify the owner, pulling ... each person aside, do you know who owns the place, where is he. If they wanted to leave, getting ID to confirm that they did not live there. There are any number of methods that the police co[u]ld have employed to locate the owner of the premises that would not have required them to invade, certainly, the private areas of the home. And I would deem that to be the second and third floors where the bedrooms are located.

In challenging the suppression ruling on appeal, the State argues that by hosting a loud party, defendant had no expectation of privacy in his home so that police conduct therein did not constitute a "search," and that even if it did, the police acted reasonably in their community caretaking function to abate the ongoing noise nuisance. We disagree.

Government action only implicates the right against unreasonable search and seizure when the State has intruded upon a defendant's reasonable or legitimate expectation of privacy. *State v. Evers*, 175 *N.J.* 355, 368–69, 815 *A.*2d 432 (2003); *State v. Marshall*, 123 *N.J.* 1, 66–67, 586 *A.*2d 85 (1991), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). Without a reasonable expectation of privacy, police action does not constitute a "search," thereby rendering the warrant requirement of the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution inapplicable. *See Evers, supra,* 175 *N.J.* at 368–69, 815 *A.*2d 432.

Ordinarily, an individual retains a reasonable expectation of privacy in his or her home, which is given "special status" by our federal and state constitutional schemes, rendering "unlawful, warrantless searches and seizures within the home [the] 'chief evil against which the wording of the Fourth Amendment is direct-

ed.'" *State v. Johnson,* 193 *N.J.* 528, 553–54, 940 *A.*2d 1185 (2008) (quoting *Welsh v. Wisconsin,* 466 *U.S.* 740, 748, 104 *S.Ct.* 2091, 2097, 80 *L.Ed.*2d 732, 742 (1984)); *see also State v. Bogan,* 200 *N.J.* 61, 72, 975 *A.*2d 377 (2009) (noting that a primary objective of the right against unreasonable search and seizure is to deter unreasonable governmental intrusion into an individual's home). However, under certain circumstances, a defendant who knowingly exposes one's home to the public has a "lessened expectation of privacy." *State v. Henry,* 133 *N.J.* 104, 117, 627 *A.*2d 125, *cert. denied,* 510 *U.S.* 984, 114 *S.Ct.* 486, 126 *L.Ed.*2d 436 (1993).

In *Henry,* for instance, the owner invited undercover police officers into her home, which "doubled as a place of illicit business," to purchase drugs. *Ibid.* Similarly, in *State v. Anglada,* 144 *N.J.Super.* 358, 365 *A.*2d 720 (App.Div.1976), we upheld a warrantless seizure of illegal drugs from the defendants who, believing them to be total strangers, permitted undercover police officers into their home where the officers observed marijuana and, on a subsequent visit, one of the defendants smoking marijuana. *Id.* at 360–61, 365 *A.*2d 720. We reasoned that the defendants' "exposure resulted, not from violation of principles pertaining to the sanctity of their home, but rather from their misplaced trust in persons about whom they know nothing." *Id.* at 363, 365 *A.*2d 720. And in *State v. Ferrari,* 323 *N.J.Super.* 54, 731 *A.*2d 1225 (App.Div.1999), involving a residence up for sale and open to tours by real estate agents, we held that a police officer posing as a potential buyer does not violate the owner's expectation of privacy when the officer enters the home. *Id.* at 56, 59, 731 *A.*2d 1225.

 Unlike those cases, here there was no open invitation to the public to enter the premises. Although crowded and noisy, there is no evidence that the party was an "open house." Merely because some in attendance were mutual friends of invited guests did not mean that total strangers would be freely admitted or welcomed. Under those circumstances and contrary to the State's contention, we do not view as any lessened or diminished the legitimate expectation of privacy that defendant, who was not even

present at the party, continued to enjoy in his residence, and even more so, in his third-floor bedroom. Nor, for obvious reasons, did defendant abandon his privacy interest by having the home indirectly exposed to the public by loud noise emanating therein.

■ Given this reasonable expectation of privacy, federal and state constitutional provisions "express[ ] a preference" that, before conducting a search, government officials should first obtain a warrant founded on probable cause issued by a neutral and detached judge " 'particularly describing the place to be searched, and the persons or things to be seized.' " *State v. Frankel,* 179 *N.J.* 586, 597–98, 847 *A.2d* 561 (quoting *U.S. Const.* amend. IV), *cert. denied,* 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.2d* 128 (2004). Recognizing, however, that some warrantless searches are both necessary and reasonable, courts have permitted a " 'few specifically established and well-delineated exceptions' to the warrant requirement." *Id.* at 598, 847 *A.2d* 561 (quoting *Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.2d* 290, 298–99 (1978)). Thus, warrantless searches have been permitted when, among other circumstances, incident to lawful arrest, consent is obtained, government officials act in a community-caretaking function, or exigent circumstances compel action. *Johnson, supra,* 193 *N.J.* at 552, 940 *A.2d* 1185. Of course, the State carries the burden of proving by a preponderance of evidence that a search falls within one of these or other carefully crafted exceptions and that it was premised on probable cause. *Ibid.; State v. Pineiro,* 181 *N.J.* 13, 19–20, 853 *A.2d* 887 (2004).

■ In determining the justification for a warrantless search, courts look to whether it was objectively reasonable under the totality of the circumstances. *Bogan, supra,* 200 *N.J.* at 81, 975 *A.2d* 377; *State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.2d* 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.2d* 695 (1984). Whether a search is reasonable " 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " *State v. O'Hagen,* 189 *N.J.* 140, 149, 914 *A.2d* 267 (2007) (quoting *Skinner v. Ry. Labor Executives' Ass'n,*

489 *U.S.* 602, 619, 109 *S.Ct.* 1402, 1414, 103 *L.Ed.*2d 639, 661 (1989)). In making that determination, the courts will apply a balancing test to assess " 'on the one hand, the degree to which [the warrantless search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *State v. Davila,* 203 *N.J.* 97, 111, 999 *A.*2d 1116 (2010) (quoting *United States v. Knights,* 534 *U.S.* 112, 118–19, 122 *S.Ct.* 587, 591, 151 *L.Ed.*2d 497, 505 (2001)).

Here, there is no real dispute that the police officers' initial entry onto the premises in response to a noise complaint was lawful, as found by the motion judge. After all, consent is a well-recognized exception to the warrant requirement, *State v. Farmer,* 366 *N.J.Super.* 307, 313, 841 *A.*2d 420 (App.Div.) (citing *United States v. Matlock,* 415 *U.S.* 164, 169–70, 94 *S.Ct.* 988, 992–93, 39 *L.Ed.*2d 242, 248–49 (1974)), *certif. denied,* 180 *N.J.* 456, 852 *A.*2d 192 (2004), but may only be obtained "from the person whose property is to be searched, from a third party who possesses common authority over the property, or from a third party whom the police reasonably believe has authority to consent." *State v. Maristany,* 133 *N.J.* 299, 305, 627 *A.*2d 1066 (1993) (citations omitted). "Appearance of control" at the time of the search, "not any subsequent resolution of questions of title or property rights," informs the court's assessment of the officer's search. *Farmer, supra,* 366 *N.J.Super.* at 313, 841 *A.*2d 420; *see also State v. Santana,* 215 *N.J.Super.* 63, 71, 521 *A.*2d 346 (App.Div.1987).

Rather, the question in this case is whether, once legitimately inside, the police acted lawfully in fanning out in search of those in control of the premises in an attempt to abate the noise nuisance. In this regard, the State relies exclusively on the community caretaker exception to the warrant requirement. On this score, the court found credible the testimony of Officer Camacho "that he and the other officers embark[ed] upon a search of the house to locate the owner or the . . . person in charge of the . . . residence[,]" but nevertheless concluded it was unreasonable for the police to extend their search beyond the first floor main living

area because "[t]here [were] no exigent circumstances." Although, as noted, we defer to the fact findings of the motion court, *Elders, supra,* 192 *N.J.* at 244, 927 *A.*2d 1250, its "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

The community caretaking doctrine represents a narrow exception to the warrant requirement, *State v. Diloreto,* 180 *N.J.* 264, 282, 850 *A.*2d 1226 (2004), reserved for " 'a core set of community caretaking activities that have a longstanding tradition and that have achieved relatively unquestioned acceptance in local communities[,]' " *id.* at 281, 850 *A.*2d 1226 (quoting Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 *U. Chi. Legal F.* 261, 302 (1998)), and " 'based on a service notion that police serve to ensure the safety and welfare of the citizenry at large.' " *Id.* at 276, 850 *A.*2d 1226 (quoting John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions,* 89 *J.Crim. L. & Criminology* 433, 445 (1999)). Recognizing that "[l]ocal police officers [perform] community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute[,]" *Cady v. Dombrowski,* 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.*2d 706, 714–15 (1973), courts allow warrantless intrusions on private places that principally serve legitimate community caretaking ends. *See Diloreto, supra,* 180 *N.J.* at 277–79, 850 *A.*2d 1226. These include "a wide range of social services, such as aiding those in danger of harm, preserving property, and 'creat[ing] and maintain[ing] a feeling of security in the community.' " *Bogan, supra,* 200 *N.J.* at 73, 975 *A.*2d 377 (alteration in original) (quoting Livingston, *supra,* 1998 *U. Chi. Legal. F.* at 271–72). One of the most common, everyday caretaking tasks of local police is the abatement of noise and mediation of noise disputes. Livingston, *supra,* 1998 *U. Chi. Legal. F.* at 272; *see also Bies v. State,* 76 *Wis.*2d 457, 251 *N.W.*2d 461, 468 (1977)

538

(noting that investigation and abatement of noise complaints is "part of the 'community caretaker' function of the police" and is "an important and essential part of the police role").

For the exception to apply, the State must show "that the community caretaking responsibility [was] a real one, and not a pretext to conduct an otherwise unlawful warrantless search." *Bogan, supra,* 200 *N.J.* at 77, 975 *A.*2d 377. Even where the police respond with a traditional law enforcement purpose, "[s]o long as the police had an *independent basis* for entering . . . under the community caretaking exception that was not a pretext for carrying out an investigatory search," the police action will be upheld. *Ibid.* (emphasis added). Thus, police officers will not be handcuffed "from fulfilling a clear community caretaking responsibility . . . merely because [they] are engaged in a concurrent criminal investigation." *Ibid.* Where such disentanglement has been demonstrated, a court will then assess the reasonableness of the officer's action in light of the particular circumstances of the case. *Id.* at 81, 975 *A.*2d 377; *Diloreto, supra,* 180 *N.J.* at 276, 850 *A.*2d 1226; *State v. Garbin,* 325 *N.J.Super.* 521, 525–27, 739 *A.*2d 1016 (App.Div.1999), *certif. denied,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000).

The United States Supreme Court in *Cady, supra,* first enumerated the community caretaker exception to justify the warrantless search of an automobile undertaken to locate a gun for the public's protection. 413 *U.S.* at 448, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718. Since then, the doctrine has been invoked most often in its original automobile setting. *Compare Diloreto, supra,* 180 *N.J.* at 269–70, 850 *A.*2d 1226 (holding that the warrantless seizure of an individual reported as "an endangered missing person" and found sitting in a car in an area frequented by individuals attempting to commit suicide, presented police with a duty to aid the defendant), *with Elders, supra,* 192 *N.J.* at 232, 241–42, 251, 927 *A.*2d 1250 (holding unlawful the warrantless search of a disabled car by state troopers who initially intended to provide roadside assistance, but which

quickly turned into a "fishing expedition" for evidence of criminality).

Although typically applied to searches of automobiles, *see State v. Hill,* 115 *N.J.* 169, 178, 557 *A.*2d 322 (1989), New Jersey courts have permitted the community caretaker exception in the home context on a case-by-case, fact-sensitive basis.[2] *See State v. Cassidy,* 179 *N.J.* 150, 161 n. 4, 843 *A.*2d 1132 (2004); *State v. Witczak,* 421 *N.J.Super.* 180, 186, 23 *A.*3d 416, 2011 *WL* 1364012 (App.Div.2011). For example, in *Bogan, supra,* upon ringing the doorbell to the apartment where an alleged child molestation occurred, the police officers heard an adult male's voice. 200 *N.J.* at 78, 975 *A.*2d 377. However, a child, not an adult, opened the door, claiming he was home alone. *Ibid.* Believing the child to be in danger, the officers walked up a staircase to the second floor, but stopped short of entering the apartment where the child claimed his father was on the telephone. *Ibid.* An officer asked the child if he could speak with his father, and the child agreed. *Ibid.* The officer entered a "few steps" into the apartment, took the phone from the child and, at that time, witnessed the defendant, who matched the description of the alleged child molester, lying on a bed in a nearby room. *Id.* at 79, 975 *A.*2d 377. The Court upheld the officers' actions as "fulfilling a basic community caretaking function—inquiring of a parent why a child was home alone on a school day in an apartment where a suspected crime had occurred." *Id.* at 78, 975 *A.*2d 377.

In *Witczak, supra,* 421 *N.J.Super.* at 186, 23 *A.*3d 416, on the other hand, a police officer responded to the victim of an alleged

---

[2] There is a split amongst the federal circuits as to whether the community caretaker exception applies only to automobiles. *Compare, e.g., Ray v. Twp. of Warren,* 626 *F.*3d 170, 177 (3d Cir.2010) (holding exception does not apply to homes), *with United States v. Quezada,* 448 *F.*3d 1005, 1007 (8th Cir.2006) (holding that "[a] police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention").

aggravated assault involving a gun. While the officer stayed with the victim who was a couple of blocks away from the alleged incident, other officers responded to the defendant's home where the defendant surrendered and exited his residence while his bedridden mother remained inside. *Id.* at 421 *N.J.Super.* at 187, 23 *A.*3d 416. After a police officer arrested and handcuffed the defendant, another officer entered the defendant's home for the sole purpose of retrieving the gun. *Id.* at 421 *N.J.Super.* at 187, 23 *A.*3d 416. We found those facts insufficient to establish an exercise of a police caretaking function since the home was surrounded, the victim was safe, the defendant was in custody and the bedridden mother was three floors away from the location of the gun. *Id.* at 421 *N.J.Super.* at 197, 23 *A.*3d 416. We emphasized that there was no exigency because the defendant's mother was the only occupant in the home and there was no risk that the gun would disappear, be destroyed or be removed from the third floor, pending application for, and execution of, a search warrant. *Id.* at 421 *N.J.Super.* at 197–99, 23 *A.*3d 416.

Several community caretaking home intrusions have been validated on the grounds that they fall within variously formulated "exigent circumstances," "emergency" or "rescue" exceptions to the warrant requirement. *See, e.g., State v. Boretsky,* 186 *N.J.* 271, 279–82, 894 *A.*2d 659 (2006); *Frankel, supra,* 179 *N.J.* at 609–12, 847 *A.*2d 561; *Garbin, supra,* 325 *N.J.Super.* at 525–27, 739 *A.*2d 1016; *State v. Leandry,* 151 *N.J.Super.* 92, 96–97, 376 *A.*2d 574 (App.Div.), *certif. denied,* 75 *N.J.* 532, 384 *A.*2d 511 (1977). Yet, while related to community caretaking and "used interchangeably in the past by our courts and by other state courts," these doctrines are actually separate exceptions. *Witczak, supra,* 421 *N.J.Super.* at 192, 23 *A.*3d 416 (and cases collected therein); *see also Cassidy, supra,* 179 *N.J.* at 161, 843 *A.*2d 1132. Indeed, in *Cassidy, supra,* the Court distinguished emergency aid from "exigent circumstances" and community caretaking as focusing on "(1) the existence of an emergency as viewed objectively, (2) a search not motivated by a desire to find evidence and (3) a nexus

between the search and the emergency." 179 *N.J.* at 161, 843 *A.*2d 1132 (citations and internal quotation marks omitted). The Court in *Bogan, supra,* drew a similar distinction:

We need not resolve whether the emergency aid doctrine or exigent circumstances also would have allowed the police officers to enter the apartment without a warrant to ensure the safety of [the youth] or other potential victims. Here, the community caretaking doctrine provided sufficient justification for the steps taken by the police. As noted, there was no headlong rush into the apartment by the police. The carefully modulated response of the officers, and of Sergeant Donato in particular, falls within the well-accepted limits of the community caretaking exception to the warrant requirement.
[200 *N.J.* at 80, 975 *A.*2d 377.]

As is evident here, the community caretaking doctrine does not fit neatly within the "exigent circumstances" or "emergency aid" constructs and therefore their analytical framework is inapposite to a consideration of whether such police action is constitutionally tolerable. Indeed, no exigency existed here at least in the traditional law enforcement sense of hot pursuit of a fleeing felon, removal or destruction of evidence, or imminent danger to life or property. Yet the constitutional allowance of such intrusions simply recognizes that "some situations addressed by officers within their community caretaking functions, though not within the scope of traditional law enforcement, can still present important government interests that may rise to the level of traditionally recognized 'exigent circumstances.'" *Ray, supra,* 626 *F.*3d at 176 (quoting *United States v. Rohrig,* 98 *F.*3d 1506, 1521–22 (6th Cir.1996)).

Thus, the relevant question in community caretaking situations focuses not on the compelling need for immediate action or the time needed to secure a warrant, but instead on the objective reasonableness of the police action in executing their service function. *Bogan, supra,* 200 *N.J.* at 80, 975 *A.*2d 377. After all, "reasonableness" is the "touchstone of the Fourth Amendment." *Florida v. Jimeno,* 500 *U.S.* 248, 250, 111 *S.Ct.* 1801, 1803, 114 *L.Ed.*2d 297, 302 (1991); *see also Ohio v. Robinette,* 519 *U.S.* 33, 39, 117 *S.Ct.* 417, 421, 136 *L.Ed.*2d 347, 354 (1996) (noting that the touchstone of the Fourth Amendment is reasonableness to be

"measured in objective terms by examining the totality of the circumstances"). The "reasonableness" determination, in turn, requires a case-by-case assessment whether an intrusion was appropriate under the circumstances. *See Bogan, supra,* 200 *N.J.* at 80–81, 975 *A.*2d 377; *Diloreto, supra,* 180 *N.J.* at 278, 850 *A.*2d 1226.

In determining what is reasonable under the circumstances, courts must make a context-specific evaluation of the competing interests at stake when police have intruded on an individual's privacy in service of important community caretaking ends. Thus, in this context, courts must balance the nature of the intrusion necessary to handle the perceived threat to the community caretaking concern, the seriousness of the underlying harm to be averted, and the relative importance of the community caretaking concern.

As to the first component of the "reasonableness" approach, the nature of the privacy interest invaded is of obvious concern, as is the degree of invasiveness of the intrusion. Most significant in this regard is the recognition of the constitutional distinction between searches of automobiles and searches of dwellings, and the special protections we afford the latter. *Payton v. New York,* 445 *U.S.* 573, 601, 100 *S.Ct.* 1371, 1387–88, 63 *L.Ed.*2d 639, 660 (1980); *United States v. U.S. Dist. Court (Keith),* 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972); *Bogan, supra,* 200 *N.J.* at 72, 975 *A.*2d 377; *Johnson, supra,* 193 *N.J.* at 554, 940 *A.*2d 1185. And in recognizing the sanctity of the home, we must also take into account whether means less drastic or invasive than those used by official authority were available to secure the articulated purpose. *See Davila, supra,* 203 *N.J.* at 111, 999 *A.*2d 1116. Also where the intrusion into the dwelling is justified at its inception, "reasonableness still requires that it thereafter be carried out in a manner consistent with the factors supporting its initial legitimacy." Livingston, *supra,* 1998 *U. Chi. Legal F.* at 17–18 (citing *New Jersey v. T.L.O.,* 469 *U.S.* 325, 341, 105 *S.Ct.* 733, 742–43, 83 *L.Ed.*2d 720, 734 (1985)). In other

words, the "reasonableness" inquiry does not end simply because police may have acted appropriately in their initial premises entry, but extends to whether their conduct once inside the dwelling exceeded the scope of their authority.

*Rohrig* is instructive. There, the police officers, responding in the early morning hours to a noise complaint, entered the defendant's home through an open back door after no one responded to their repeated banging on the front door and shouting to announce their presence. *Rohrig, supra,* 98 *F.*3d at 1509. Upon entry, the officers continued to call loudly for an occupant but found no one. *Ibid.* Noticing a light emerging from the basement stairwell, the police descended into the basement where they observed wall-to-wall marijuana plants, as well as fans and running water. *Ibid.* Finding no one in the basement, the officers ascended to the upper floor where they discovered the defendant—the only occupant in the house—sleeping next to the unattended stereo blaring loud music. *Ibid.* After turning down the volume, the police arrested the defendant on drug charges. *Id.* at 1509–10.

The Sixth Circuit upheld the seizure of evidence in *Rohrig,* casting its analysis in "reasonableness" terms. *Id.* at 1524. On this score, the court observed that the officers who entered the defendant's home were not acting principally to enforce the law— meaning, their main purpose was not to cite the defendant for making too much noise. *Id.* at 1521. They were instead acting for the important purpose of abating a nuisance and restoring the neighbors' "peaceful enjoyment of their homes and neighborhood." *Ibid.* Thus, "there is less cause for concern that they might have rashly made an improper decision." *Id.* at 1523. Moreover, the effort to obtain a warrant would have "subject[ed] the community to a continuing and noxious disturbance for an extended period of time." *Id.* at 1522. Significant for present purposes, the court's decision was carefully limited to the facts before it: "We wish to emphasize the fact-specific nature of this holding. By this decision, we do not mean to fashion a broad 'nuisance abatement' exception to the general rule that warrantless entries into private

homes are presumptively unreasonable." *Id.* at 1525 n. 11. The court concluded simply that under the circumstances presented, it was "unable to identify any unreasonable conduct on the part of the police." *Id.* at 1524.[3]

We agree with *Rohrig* to the extent that there is no broad "nuisance abatement" exception to the general rule that warrantless entries into private homes are presumptively unreasonable. We adhere, as did the *Bogan* Court, to the "objectively reasonable" test, *Bogan, supra,* 200 *N.J.* at 81, 975 *A.*2d 377, and to the case-specific nature of the inquiry.

Governed thusly by the reasonableness standard, and weighing all of its component competing interests, we conclude that the police action in this instance was not constitutionally permitted. Although police entry into the dwelling was initially justified, their subsequent action in fanning out and conducting, in essence, a full-blown search of the home was neither reasonably related in scope to the circumstances that justified the entry in the first place nor carried out in a manner consistent with the factors supporting the entry's initial legitimacy. Indeed, unlike *Rohrig,* the objective of noise abatement could have been achieved well short of the full-scale search engaged in by the officers in this matter.

Quite independent of Officer Camacho's efforts on the third floor, the dwelling's occupants were identified on the first floor within five to ten minutes of police arrival. Despite initially failing to answer the officers' repeated calls, the resident hosts came forward by the time Camacho descended the stairs, and the noise presumably was abated. Moreover, other measures short of

---

[3] As the Third Circuit noted in *Ray, supra,* 626 *F.*3d at 176–77, the Sixth Circuit itself has questioned whether *Rohrig* created a new community caretaker exception to the warrant requirement for entry into a home. *See United States v. Williams,* 354 *F.*3d 497, 508 (6th Cir.2003) ("[D]espite references to the doctrine in *Rohrig,* we doubt that community caretaking will generally justify warrantless entries into private homes.").

room-by-room, and floor-by-floor canvassing were available to the police, as detailed by the motion judge. Unlike *Rohrig*, where the sole occupant in the home was sleeping and thus the police were unable to locate the source of the loud music and turn down the volume, here the offending noise emanated from the crowd itself, which the police could easily have dispersed or otherwise brought under control given the number of officers present.

The instant situation is also unlike *State v. Namay*, 106 *Ohio Misc.*2d 72, 735 *N.E.*2d 526 (Cleveland Heights, Ohio Mun. Ct.2000), where the need to take immediate action involving a large, late-night party disrupting the neighborhood arose not from loud noise but from the apparent number of very intoxicated underage partygoers who had begun to flee from the police—an "exigency" requiring immediate action. *Id.* at 531. Here, as noted by the motion judge, there was no indication of alcohol-induced ailments, physical distress, or the need for medical assistance or protection of persons or property from imminent harm.

■ Balancing all of the constituent competing interests, we conclude that the State has failed to demonstrate the objective reasonableness of its agents' claimed exercise of their community caretaking function. In striking this balance against the constitutionality of the police action in this instance, we weighed, on the one hand, the important privacy interest in one's home as well as the breadth and extent of the invasion involving the entire premises, against, on the other hand, the limited nature of the community caretaking concern and the relatively low threat posed thereto, especially in light of the availability of less drastic options. Absent justification to search the entire house, Officer Camacho was not lawfully in the hallway outside defendant's bedroom when he viewed the ecstasy. Therefore, the entry into defendant's bedroom and seizure of the drugs therein cannot be sustained under the plain-view doctrine. *See Horton v. California*, 496 *U.S.* 128, 137, 110 *S.Ct.* 2301, 2308, 110 *L.Ed.*2d 112, 123 (1990); *State v. Johnson*, 171 *N.J.* 192, 206, 793 *A.*2d 619 (2002).

In reaching this conclusion, we reject any suggestion that there is an automatic noise abatement exception to the warrant requirement. By the same token, we do not mean to imply that the noise abatement objective can never justify a premises search. Rather, we reiterate that, applying all relevant component factors, the "reasonableness" assessment remains highly fact-sensitive and must abide a case-by-case approach.

Affirmed.