**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3492-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOSHUA L. RODRIGUEZ, a/k/a
MARQUELL RODRIQUEZ,

    Defendant-Appellant.

_____

Submitted November 14, 2019 – Decided January 29, 2020

Before Judges Alvarez and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 15-04-0290.

Joseph E. Krakora, Public Defender, attorney for appellant (Michael James Confusione, Designated Counsel, on the brief).

Charles A. Fiore, Gloucester County Prosecutor, attorney for respondent (Jonathan E. W. Grekstas, Assistant Prosecutor, on the brief).

PER CURIAM

A jury found defendant Joshua L. Rodriguez guilty of first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-9. On April 21, 2017, the trial judge sentenced him to eighteen years subject to the No Early Release Act's (NERA) mandatory service of eighty-five percent of the term of imprisonment. N.J.S.A. 2C:43-7.2. Defendant appeals his conviction and sentence. We affirm.

We draw the facts from the trial record. On October 31, 2014, the victim D.C.[1] was discovered unconscious in his bedroom by his father. D.C.'s father called 911. Beneath the victim's body, emergency personnel and police observed a syringe and torn open blue wax folds stamped "Twitter." The items were not collected because the authorities initially responded to the incident as a medical emergency—the victim died, however, on the way to the hospital.

When police returned a few days later, they searched the victim's bedroom and seized a prescription pill container, hypodermic syringe, three opened blue wax empty heroin folds marked "Twitter," and a bundle of similar folds containing heroin. The victim's phone contained several text messages regarding drug buys from a person initially identified as "Mikey Engate."

---

[1] Initials are being used to protect the privacy of the victim's family. See R. 1:1-2.

A-3492-17T2

Woolwich Township Police Department Detective Christopher Beckett testified that after collecting the evidence and photographing the relevant text messages, he contacted a friend of the victim, Cody Hassler. The victim's text messages established he had arranged for Hassler to drive him to Camden to purchase heroin on the evening of his death. Hassler described Engate to police, including the fact he had a barcode tattoo on the back of his neck. Beckett matched Hassler's description of Engate with defendant, and matched the victim's cell phone calls to defendant's phone. On the stand, Hassler denied telling Beckett that defendant also had a tattoo on his right hand.

A Gloucester County Prosecutor's Office Detective, Anthony Gabarino, who was not involved in the investigation, showed Hassler a photo array that included defendant's picture. Hassler identified Engate's photo, and then explained that Engate was a drug dealer from Camden. On the night the victim died, Hassler drove D.C. to purchase drugs in North Camden, and in exchange the victim gave him six bags of heroin. The victim bought three bundles of the drug.

When shown the array, Hassler selected defendant's photo and was 100% certain he had identified the dealer from Camden from whom the victim had bought drugs. Because Hassler and the detective did not agree as to whether

A-3492-17T2

defendant's photograph was numbered seven or eight, Hassler asked to see it again, and the detective showed it to him. On the recording of the out-of-court identification process, the detective acknowledged that Hassler correctly recalled the number on the photograph, but that he, the detective, got it wrong.

Hassler explained to the detective that he injected the six bags he was given. The victim shot up three bags, but became ill. Hassler kept him awake and another friend got him some food, after which D.C. seemed to recover. Hassler added that all the bags that were purchased that night were stamped "Twitter." Since D.C. seemed to be feeling alright, Hassler and the other two people with him dropped the victim off at a liquor store within walking distance of his home.

During her opening statement, defendant's attorney argued to the jury that the phone number identified as belonging to the dealer from whom the victim bought the heroin that night could not have been defendant because he was in jail that night. Furthermore, she claimed his cell phone was a "burner phone," and that "it is common for one burner cell phone to be used by more than one person [in the drug trade]." Therefore, she argued the message sent to the victim from the phone could not be from defendant.

A-3492-17T2

The medical examiner testified D.C.'s death was accidental, attributable to his consumption of heroin. His opinion, to a reasonable degree of medical certainty, was based on tests conducted on blood and urine samples taken from the body. He explained that the term "overdose" was not accurate—there is no such thing as a safe level of heroin or cocaine—rather, consumption makes it a drug-induced death, or makes death an adverse effect of the drug.

The State also called a toxicologist who testified regarding metabolites of heroin found in the victim's blood and urine. Traces of suboxone were found in D.C.'s urine, but they were waste products not evidential as to toxicity. When drugs are found in urine, the body has already processed the substances and was disposing of it. The toxicologist considered the suboxone not to be evidential as to lethality, toxicity, or impairment because none was found in D.C.'s blood.

A different judge from the judge who tried the case began a pretrial hearing on the out-of-court identification. He stopped the hearing, however, when defense counsel's main objection seemed to be that she was not given the actual video of the display of the photo array, although she had the transcripts and the photographs in her possession. Counsel unsuccessfully argued that the procedure was suggestive because the detective showed Hassler the photographs twice.

5

The judge found further proceedings were unnecessary because Hassler's identification of defendant was unequivocal, based on prior contacts. The judge further found that the out-of-court identification was properly recorded, and the witness correctly instructed as to the procedure he was to follow. As the judge said, the proofs could not be clearer. The State would be permitted to present the out-of-court identification to the jury.

At the close of the State's case, defendant moved for acquittal contending no reasonable juror would connect the heroin found in the victim's system with that in the blue wax folds that Hassler claimed the victim bought from defendant. Defendant claimed that the State's proof left a reasonable doubt that the heroin from which the victim had died could have come from another source, because the empty bags found near his body were not seized. Furthermore, the medical examiner did not perform an autopsy and so could not rule out causes of death such as heart disease, strokes, or blood clots, and had no information about D.C.'s past medical or psychiatric history. Defense counsel said that the presence of suboxone raised the possibility that it was the suboxone, not the heroin, that caused the death. Finally, counsel attacked Hassler's credibility, stating that the discrepancies between different statements he made to police cast doubt on his credibility.

Giving the State all reasonable inferences, and leaving the issue of credibility to the trier of fact, the judge found a reasonable jury could reasonably infer that the heroin found in the victim's body came from the bundle he purchased from defendant, while accompanied by Hassler, shortly before his death. It was reasonable for a jury to conclude that the drugs sold to him caused his death.

At sentencing, the judge found aggravating factors three, five, six, and nine. N.J.S.A. 2C:44-1(a)(3), (5), (6), (9). She accorded them moderate weight except for factor nine. She gave factor nine greater weight because of the real potential of death from drug use, and society's interest in stopping drug distribution. The judge found factors five, eight, and nine in mitigation, although she gave all but five slight weight, and to five she gave moderate weight. She denied the State's motion for a discretionary extended term. See N.J.S.A. 2C:43-7; see also N.J.S.A. 2C:43-6(f). Thus, balancing defendant's two prior drug-related convictions and considering his involvement in the drug distribution world, the judge imposed an eighteen-year NERA sentence.

On appeal, defendant raises the following points for our consideration:

> Point 1 The trial court erred in denying defendant's motion for acquittal of the drug-induced death charge.

7                                                                    A-3492-17T2

Point 2    The trial court erred in failing to hold a complete Wade[2] hearing and apply governing law on the admissibility of the out-of-court identification of the defendant.

Point 3    Reference to defendant having been "in jail before" caused an unfair trial for defendant below.

Point 4    The trial court erred in denying a mistrial after a discovery problem caused by the prosecution.

Point 5    Defendant's sentence is improper and excessive.

I.

Defendant's first point is that the trial judge erred in denying his motion for acquittal. We review the decision employing the same standard as the trial court. See State v. Fuqua, 234 N.J. 583, 590 (2018) (citing State v. Sugar, 240 N.J. Super. 148, 153 (App. Div. 1990)). After giving the State the benefit of all favorable testimony and all favorable inferences that could be reasonably drawn therefrom, we decide whether the evidence viewed in its entirety suffices for the jury to find guilt beyond a reasonable doubt. Id. at 590-91.

---

[2] U.S. v. Wade, 388 U.S. 218 (1967).

Strict liability for drug-induced death requires the State to prove beyond a reasonable doubt that the drug which led to the victim's death was taken from the packets sold to him by defendant. The State established that element of the offense.

An officer who first arrived at the scene and an emergency technician (EMT) saw a syringe on the ground near the victim. The EMT saw both a syringe and empty blue wax folds. These packets had the same appearance as the packets from the bundle stamped "Twitter" later found in D.C.'s bureau.

Hassler testified that the bundles D.C. purchased from defendant consisted of blue wax folds stamped "Twitter." The jury heard Hassler tell Gabarino during the recorded interview that the blue wax folds D.C. bought from defendant were similar in appearance. A reasonable jury had a substantial basis to conclude beyond a reasonable doubt that the drugs which ultimately led to the victim's death were purchased from defendant. Thus defendant's motion for acquittal was properly denied.

II.

Defendant contends on appeal that the medical examiner's testimony did not prove that heroin consumption killed D.C. This point also lacks merit. The

A-3492-17T2

medical examiner stated that D.C. died as a result of his consumption of heroin, and that the suboxone found in his urine was not the cause of death.

The toxicologist agreed—suboxone was found in decedent's urine, not his blood, and in amounts that did not give rise to an inference of "lethality, toxicity, or impairment." Thus, the State presented ample medical proof that D.C.'s heroin consumption caused his death, and although defendant attacks the expert opinions as without merit, no expert testimony was offered to refute them. Nothing inherently makes the testimony of the two different experts, giving essentially the same opinion, illogical or incredible.

## III.

Defendant also contends that Hassler's identification of defendant did not prove he was the seller beyond a reasonable doubt. Defendant attacks Hassler's testimony on the basis that the details he gave were at times inconsistent. For example, the police report stated Hassler described defendant as having a tattoo on his right hand, when he did not. On the stand, Hassler denied saying that. It is not, however, a detail of such consequence as to make it error for a reasonable jury to find guilt.

Hassler's identification during the photo array was unequivocal. He had known defendant for some time and knew him as a drug dealer. Hassler

described not only defendant's general appearance but also the tattoo on the back of his neck. Hassler identified defendant in court. Therefore, the court properly denied the motion for acquittal based on alleged shortcomings in Hassler's identification.

IV.

Defendant urges us to find that the court erred by not completing the Wade hearing. But defense counsel was unable to identify even one factor establishing any suggestiveness in the identification procedure. And to be entitled to a Wade hearing, a defendant must first proffer "some evidence of suggestiveness" that could result in a misidentification. State v. Henderson, 208 N.J. 208, 238, 288 (2011). No such evidence was presented, thus the identification would be admissible at trial. See State v. Micelli, 215 N.J. 284, 293 (2013) ("If a judge finds that the identification was not impermissibly suggestive, then the evidence may be admitted at trial.").

When Hassler and Gabarino disagreed about the number on the photo Hassler identified, that required the witness to be shown defendant's picture again. Hassler was shown defendant's picture twice, a seeming impropriety, but the reason the detective did so was his disagreement about the number on the back of the photo. The officer merely wanted confirmation that he had entered

11

the correct number into his notes. It was Hassler who initially identified defendant from his photo; it was Hassler who remembered the correct number. The record supports Hassler's identification as reliable. Nothing in the record supports the suggestion that Hassler himself could have been the seller of the lethal drug. The Wade hearing went far enough.

V.

Beckett testified that after Hassler described defendant, Beckett pursued the tip via a contact at the Camden County Police Department. Beckett further testified that someone from Camden County identified defendant as a potential suspect based on the description. At that point, the court immediately told the jury to totally disregard any reference to defendant having been previously jailed, and that the information could not be included during jury deliberations.

The judge's prompt curative instruction, striking the testimony from the record, adequately addressed any potential prejudice. We assume that jurors will follow instructions, and thus do not find any reference to defendant having been in jail, or references that the jury might have construed as meaning that defendant had been in jail, to be harmful. State v. Farmer, 366 N.J. Super. 307, 319 (App. Div. 2004) ("The jury is presumed to adhere to instructions, and we must assume the jury followed that mandate."). When the point was raised by a

witness, the judge promptly told the jury not to consider that factor. Thus there is no basis for reversal on this issue.

VI.

Defendant also argues that the trial court erred in denying the motion for a mistrial because of a discovery problem caused by the prosecution. In her opening statement, counsel argued that defendant could not have been the dealer with whom the victim was communicating because he was in jail at the time. The prosecution had provided defense counsel with an extraction report of text messages in which the date designation was in Greenwich Mean Time, meaning the day was listed first, the month next, and the year last. As a result of the manner in which the dates of the text messages were listed on the report, counsel mistakenly thought the message regarding defendant selling drugs to the victim was dated April 11, 2014, as opposed to October 31, 2014. In discovery, the prosecution also informed defendant that the cell phone extraction had not resulted in information having evidential value.

After hearing the opening statement, the prosecution explained to counsel that she misunderstood the cell phone extraction record report. The prosecutor also clarified there were saved messages exchanged on the relevant date between D.C. and defendant. As a result, defendant moved for a mistrial.

13

The first date listed on the extraction report gives the date as "15/12/2014." This indicates a European date format and was corroborated by the investigator's corresponding written report stating the extraction was performed on December 15, 2014. The material was in counsel's hands some six months before trial.

That the State represented there was no material having evidentiary value in the cell phone extraction report is not a failure to fulfill a discovery obligation. The issue here is not that the reports were withheld, but rather, that the State's summary was wrong—that is not a discovery violation.

Even if counsel had relied on the report, as opposed to the original material, counsel's argument to the jury that the phone was a burner phone that could have been used by anyone who was a street level drug distributor, not necessarily defendant, was unaffected by the extraction report. The text messages between defendant and D.C. from defendant's phone were never recovered. This argument has no merit.

VII.

We review a judge's sentencing decision under an abuse of discretion standard asking whether: "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based

upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (alterations in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

The judge did not violate the sentencing guidelines. The aggravating and mitigating factors were supported by credible and competent evidence in the record, and the judge did not err in the weight she accorded to those considerations. We do not agree with defendant that the judge should have further explained her rejection of mitigating factors two and thirteen. It does not follow logically, as defendant suggests it, that a strict liability crime must result in the judicial finding that a defendant did not contemplate that his or her conduct would cause harm. Every drug dealer knows the harm drugs cause and the potential for the greatest harm of all. Defendant was not a youthful offender substantially influenced by a more mature person—nothing supports this claim.

The judge exercised her discretion by not granting the State's motion to sentence defendant to an extended term. In light of the weight she accorded the aggravating factors, and the lesser weight of the mitigating factors that she found, a sentence on the higher end of the ordinary range does not shock the judicial conscience. Roth, 95 N.J. at 364-65.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

16