**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5470-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHARLES E. ALFORD,
a/k/a CHARLES ALFORD,

     Defendant-Appellant.

_____

        Submitted May 11, 2021 – Decided June 28, 2021

        Before Judges Gilson and Moynihan.

        On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment Nos. 16-10-2849 and 16-12-3621.

        Joseph E. Krakora, Public Defender, attorney for appellant (Michael Denny, Assistant Deputy Public Defender, of counsel and on the brief).

        Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Rachel M. Lamb, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following the denial of motions to suppress two handguns seized during separate searches, defendant Charles Alford pled guilty to two counts of attempted murder, N.J.S.A. 2C:5-1(a)(1) and N.J.S.A. 2C:11-3(a)(1), involving separate victims. In accordance with his plea agreement, defendant was sentenced to concurrent terms of ten years in prison with periods of parole ineligibility and parole supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals, contending that the trial court erred in denying both motions to suppress the seizures of the handguns. We discern no basis to reject the factual findings made by the motion judge and therefore affirm both orders and convictions.

## I.

On June 9, 2013, S.G. (Sam) was shot and seriously injured in Camden.[1] The following month, on July 30, 2013, C.G. (Chuck) was shot and seriously injured in Camden. Both shootings were eventually linked to defendant.

---

[1] We use initials and fictitious names for the victims and witnesses to protect their privacy interests.

  A-5470-18

On June 26, 2013, Camden County Police Officer Romelia Villegas-Diaz received a tip that the next day a tan or gold Cadillac would be dropping off drugs on Berkeley Street in Camden. Accordingly, on June 27, 2013, Officer Villegas-Diaz patrolled that area in a marked police vehicle. At approximately 1:47 p.m., she observed a gold Cadillac with tinted windows, and she stopped that vehicle. The Cadillac had one occupant, the driver, who was later identified as defendant. Defendant did not have a driver's license and, following a check, Villegas-Diaz learned that there were outstanding warrants for defendant's arrest. Consequently, the officer arrested defendant and placed him in the rear of her patrol car.

Officer Villegas-Diaz then returned to the Cadillac and looked in its windows. While standing outside the front passenger door, Villegas-Diaz saw the black handle of what she believed was a gun. She thereafter opened the car door and observed an M88 .38 special revolver. The weapon was photographed, seized, and later determined to be loaded. Defendant was charged with unlawful possession of a gun and given summonses for driving without a license and driving a vehicle with tinted windows. Apparently, the gun was not immediately linked to Sam's shooting, and defendant was released from custody.

3

On July 31, 2013, the day after Chuck was shot, law enforcement personnel received a tip that the shooter was a young man named Mac who drove a gold Cadillac. That same day, Investigator Joseph Goonan of the Camden County Sheriff's Office stopped a Cadillac driven by defendant. During the vehicle stop, L.G. (Lucy) arrived and told investigators that she was defendant's girlfriend, and defendant went by the name Mac. She also gave the investigators her address. Defendant was not arrested on that day. Several days later, on August 2, 2013, defendant was charged with first-degree attempted murder and other offenses for Chuck's shooting, and a warrant for his arrest was issued.

On October 30, 2013, law enforcement personnel received a tip that defendant might be at Lucy's home in Camden. Accordingly, several members of the U.S. Marshals Fugitive Task Force placed Lucy's home under surveillance. That same day, a black man matching defendant's description was seen going into Lucy's residence. As members of the task force approached the residence, Lucy drove up. According to the task force members, Lucy gave them verbal and written consent to search for defendant in her home.

While searching for defendant, law enforcement personnel located a .9 mm loaded handgun in a couch cushion on the first floor of Lucy's home. Thereafter, Lucy gave a statement, during which she told detectives that the gun

belonged to defendant. Defendant was not found at Lucy's home, but later that day he was located and arrested.

Law enforcement personnel subsequently connected the .9 mm handgun to Chuck's shooting. The .38 caliber handgun seized from the vehicle was connected to the shooting of Sam.

In December 2013, a grand jury indicted defendant for first-degree attempted murder and numerous weapons offenses related to the shooting of Sam. Several months later, in April 2014, a second indictment was issued charging defendant with first-degree attempted murder and weapons offenses related to the shooting of Chuck. In 2016, superseding indictments were issued in both matters.

Defendant filed two separate motions seeking to suppress the handgun seized from the Cadillac and the handgun seized from Lucy's home. The same judge conducted separate evidentiary hearings on those motions.

In the hearing related to the search of the vehicle, the judge heard testimony from four witnesses: Officer Villegas-Diaz, defendant, M.H., a friend of defendant, and M.F., defendant's fiancée.

Officer Villegas-Diaz testified that she stopped the Cadillac in Camden on June 27, 2013 based on an anonymous tip she had received the previous day,

and her observation that the vehicle had tinted windows. She also explained how she arrested defendant when she learned that he had outstanding warrants. Further, she testified that after defendant had been secured in her vehicle, she looked through the front passenger window of the Cadillac and saw the black handle of what she believed was a gun on the car's floor, partially obscured by the front passenger seat. She therefore opened the door to confirm her suspicion. The gun was subsequently photographed and seized.

Defendant and his two witnesses told a different version of events. The two witnesses testified that it would be difficult to see through the Cadillac's tinted windows. Moreover, defendant, his friend, and his fiancée testified that they saw Officer Villegas-Diaz open the Cadillac's doors and look inside the vehicle.

The motion judge found Officer Villegas-Diaz's testimony credible. The judge then found that the Cadillac had been stopped after the officer observed tinted windows and that the gun had been lawfully seized under the plain view doctrine. Accordingly, the judge denied defendant's motion to suppress the seizure of the .38 caliber handgun found in the vehicle.

6

In a separate hearing concerning the search of Lucy's residence, the motion judge heard testimony from several law enforcement officers, Lucy, and members of Lucy's family.

Investigator Goonan explained that he had learned of Lucy and defendant's dating relationship when he stopped the Cadillac driven by defendant on July 31, 2013. Other members of the task force testified concerning the search of Lucy's home. They explained that they had received an anonymous tip that defendant was going to be at Lucy's home.

When they set up surveillance of the home on October 30, 2013, they saw someone matching defendant's description enter the home. At approximately the same time, Lucy arrived at the home. A detective explained to Lucy that they had a warrant for defendant's arrest, and he showed Lucy a picture of defendant. Initially, Lucy denied knowing defendant, but then admitted that he was her boyfriend and sometimes stayed at her home. The detective testified that Lucy then gave verbal consent to search the home. While members of the task force searched the home, another officer asked Lucy to execute a written consent form for the search, which she did.

Members of the task force also explained that when they searched Lucy's home, they looked for places where defendant might be hiding, including inside

A-5470-18

furniture. During that search, a .9 mm handgun was discovered in a couch cushion on the first floor of Lucy's home. The team continued to search the rest of the home, but defendant was not located.

Members of the task force thereafter received a tip that defendant was at another location. After officers went to that location, defendant was found and arrested.

Lucy told a different version of events. She testified that on October 30, 2013, she went to leave her home, but was confronted by at least six officers armed with guns. She was directed to put her hands up and was then placed in handcuffs. She denied giving consent to search her home. Instead, she explained, the officers went into the home without her consent and found the gun. The officers thereafter suggested that they might call child protective services if she did not sign a consent form. She testified she signed the form under duress.

After hearing the testimony and considering the evidence submitted, the motion judge denied defendant's motion and made findings of facts and conclusions of law on the record. The judge found the officers' testimony credible, and he rejected Lucy's testimony. The judge went on to find that law enforcement personnel had lawfully entered Lucy's home based on two

exceptions to the warrant requirement. First, the judge reasoned that the task force had an arrest warrant for defendant and had reasonable bases to believe that defendant was in and resided at Lucy's home. Second, the court found that Lucy had given knowing and voluntary consent to search her home. The court then went on to find that the handgun was lawfully seized under the plain view exception to the warrant requirement.

## II.

Defendant appeals, challenging both his convictions and arguing that the searches of the vehicle and Lucy's home were illegal. Specifically, defendant articulates those arguments as follows:

> POINT I – BECAUSE OFFICERS ENTERED A PRIVATE RESIDENCE WITHOUT A WARRANT OR VALID CONSENT, THE POLICE ENTRY WAS ILLEGAL, AND THE HANDGUN DISCOVERED MUST BE SUPPRESSED AS FRUIT OF THE UNLA[W]FUL ENTRY.
>
> A. The Officers[] Did Not Have A Reasonable Basis To Believe That [Defendant] Lived With [Lucy]
>
> B. [Lucy] Did Not Give Valid Consent To Search Her Home
>
> POINT II – THE PLAIN VIEW EXCEPTION TO THE WARRANT REQUIREMENT DOES NOT APPLY BECAUSE THE DI[S]COVERY OF THE HANDGUN WAS NOT INADVERTENT.

9

Our review of a denial of a motion to suppress physical evidence following an evidentiary hearing is limited. See State v. Handy, 206 N.J. 39, 44 (2011). Appellate courts disturb factual findings made by trial courts only when they are not supported "by sufficient credible evidence in the record." State v. Hagans, 233 N.J. 30, 37 (2018) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). That deference is afforded "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Gamble, 218 N.J. at 424-25 (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Accordingly, we "reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" Hagans, 233 N.J. at 37-38 (quoting Gamble, 218 N.J. at 425). We review the trial court's legal determinations de novo. Id. at 38 (citing Gamble, 218 N.J. at 425).

The United States Constitution and the New Jersey Constitution protect individuals from "'unreasonable searches and seizures' by government officials." Ibid. (quoting State v. Watts, 223 N.J. 503, 513 (2015)). A warrantless search is presumptively unreasonable. Ibid. To overcome that presumption, the State must prove by a preponderance of the evidence that the search was based on

probable cause and "f[ell] within one of the few well-delineated exceptions to the warrant requirement." Id. at 38-39 (alteration in original) (quoting State v. Bryant, 227 N.J. 60, 69-70 (2016)). Several exceptions to the warrant requirement are applicable to the search of the Cadillac and the search of Lucy's home.

A.    The Search of the Cadillac

Defendant argues that the handgun found in the Cadillac was unlawfully seized because the officer did not "inadvertently" discover the firearm as required by the plain view exception to the warrant requirement. We disagree.

To lawfully stop a motor vehicle, a police officer must have a "reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense." State v. Scriven, 226 N.J. 20, 33-34 (2016) (citing State v. Locurto, 157 N.J. 463, 470 (1990)). Accordingly, an investigatory stop is permissible "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." State v. Chisum, 236 N.J. 530, 545-46 (2019) (quoting State v. Pineiro, 181 N.J. 13, 20 (2004)).

"[I]n determining the lawfulness of an investigatory stop, a reviewing court must 'evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)). "An investigative detention that is premised on less than reasonable and articulable suspicion is an 'unlawful seizure,' and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule." State v. Elders, 192 N.J. 224, 247 (2007) (citing State v. Rodriguez, 172 N.J. 117, 132-33 (2002)).

After hearing the testimony of Officer Villegas-Diaz, the motion judge found that she had acted with reasonable and particularized suspicion in stopping the Cadillac. Specifically, the motion judge found the officer testified credibly that she had stopped the vehicle because it had tinted windows.

The plain view exception allows police to seize contraband in plain view without a warrant if three requirements are met: "(1) the officer must be lawfully in the viewing area when making the observation; (2) 'the discovery of the evidence . . . must be inadvertent,'" State v. Gonzales, 227 N.J. 77, 91 (2016) (alteration in original) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 468-

69 (1971)); and (3) the "police officer must have 'probable cause to associate the property with criminal activity,'" State v. Bruzzese, 94 N.J. 210, 237 (1983) (quoting Texas v. Brown, 460 U.S. 730, 738 (1983)).

In Gonzales, the New Jersey Supreme Court eliminated the inadvertence prong of the plain-view test. 227 N.J. at 101. The Court, however, applied that new rule of law prospectively as of the date of the opinion – November 15, 2016. Ibid. The search at issue in this case took place on June 27, 2013, and therefore we analyze the officer's actions under the pre-Gonzales standard.

An "observation into the interior of an automobile by a police officer located outside the automobile is not a 'search' within the meaning of the Fourth Amendment." State v. Reininger, 430 N.J. Super. 517, 534 (App. Div. 2013) (quoting State v. Foley, 218 N.J. Super. 210, 215 (App. Div. 1987)). When an officer seizes contraband in plain view from an automobile, it is "not necessary for the State to establish exigent circumstances." Id. at 537.

In this case, the motion judge credited Officer Villegas-Diaz's testimony that, while standing outside the Cadillac, she looked through the passenger side front window and saw the black handle of what she perceived to be a gun on the floor. The motion judge also found that the gun was discovered inadvertently. In that regard, the motion judge reasoned that once defendant was arrested, there

was nothing unlawful in the officer looking into the unoccupied Cadillac. Those factual findings are supported by substantial credible evidence. We therefore discern no basis to reverse the motion judge's determination that the .38 caliber handgun was lawfully seized.

B.    The Search of the Home

Defendant also argues that law enforcement officers unlawfully entered Lucy's home and therefore the seizure of the .9 mm handgun was illegal. We reject this argument.

The motion judge found two bases for the entry into Lucy's home. First, that the task force members had a valid arrest warrant and had reasonable bases to believe that defendant was present and resided in Lucy's home. Second, that Lucy provided knowing and voluntary consent to search her home. We hold that the consent was valid and, therefore, we need not address whether the arrest warrant was lawfully executed at the home of a third-party.

To justify a warrantless search based on consent, "the State must prove that the consent was voluntary and that the consenting party understood his or her right to refuse consent." State v. Maristany, 133 N.J. 299, 305 (1993) (citing State v. Johnson, 68 N.J. 349, 353-54 (1975)). "[T]he State is required to prove voluntariness by 'clear and positive testimony.'" State v. Chapman, 332 N.J.

Super. 452, 466 (App. Div. 2000) (quoting State v. King, 44 N.J. 346, 352 (1965)).  Moreover, the State must "show that the individual giving consent knew that he or she 'had a choice in the matter.'"  State v. Carty, 170 N.J. 632, 639 (2002) (quoting Johnson, 68 N.J. at 354).

Factors "tending to show that the consent was coerced" include:  (1) consent was obtained from a person who had already been arrested; (2) it was obtained notwithstanding a denial of guilt; (3) the police obtained consent only after the consenting person had refused initial requests for consent; (4) consent was given where the subsequent search led to the seizure of contraband "which the accused must have known would be discovered;" and (5) consent was given by a person in handcuffs.  King, 44 N.J. at 352-53 (citations omitted).

Factors "tending to show the voluntariness of the consent" include:  "(1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers."  Id. at 353 (citations omitted).

"[T]he existence or absence of one or more of the above factors is not determinative of the issue."  Ibid.  Instead, the factors "are only guideposts to aid a trial judge in arriving at his [or her] conclusion."  Ibid.

At the evidentiary hearing concerning the motion to suppress the gun seized from Lucy's home, the motion judge heard testimony from several law enforcement officers. The judge found their testimony regarding the oral and written consent provided by Lucy credible. The judge also considered, but rejected, Lucy's contradictory testimony that she had not given valid consent.

We discern no basis for rejecting the motion judge's factual findings that Lucy gave consent voluntarily, and that she understood her right to refuse consent. Those factual findings are supported by the officers' testimony, which the motion judge found credible. Moreover, the factual findings are corroborated by the written consent form Lucy executed. Finally, there are more factors tending to show that the consent was voluntary than factors tending to show that the consent was coerced.

The motion judge credited the officers' testimony that after obtaining consent from Lucy, they searched the home looking for defendant. The motion judge also found credible that the officers had prior experiences during which suspects hid inside hollowed out furniture. Therefore, the motion judge credited their testimony that they picked up the couch's cushions to see if there was a compartment in which defendant was hiding, and, in doing so, inadvertently discovered the gun in a couch cushion. The plain view exception allows police

16

to seize contraband without a warrant when they are lawfully in an area and they inadvertently discover evidence associated with criminal activity. See, e.g., State v. Farmer, 366 N.J. Super. 307, 313-15 (App. Div. 2004); see also State v. Domicz, 188 N.J. 285, 291, 310-11 (2006) (finding law enforcement seizure of marijuana plants observed in plain view during residential consent search lawful).

All those findings are supported by substantial credible evidence in the record, and we discern no error in the trial court's application of the law to the factual findings. Accordingly, we also affirm the denial of defendant's motion to suppress the handgun seized from Lucy's home and defendant's subsequent conviction based on his guilty plea.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION